UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MASACHUSETTS

CIVIL ACTION NO.

ADVANCED VISUAL SYSTEMS, INC.
        Plaintiff

V.

UNCHAINED LABS
        Defendant

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

## **VERIFIED COMPLAINT**

1.  The plaintiff, Advanced Visual Systems, Inc., is a Nevada corporation, that is registered as a foreign corporation in Massachusetts, having a principal place of business at 2 Burlington Woods Drive, STE 100, Burlington, Ma. 01803. (hereinafter " AVS"). AVS is engaged in the computer software business.

2.  The defendant, Unchained Labs (hereinafter "Unchained Labs"), is a Delaware corporation, that is registered as a foreign corporation in Massachusetts.  Unchained Labs has a principal place of business at 6940 Koll Center PKWY, STE 200, Pleasanton, CA 94566.  Unchained Labs also does business in Massachusetts and has a business address at 1380 Soldier Field Road, STE 1000, Brighton, Massachusetts 02135.

3.      AVS is the sole owner of the proprietary copyright rights to use the software known as "OpenViz".  OpenViz is a data visualization software that AVS sublicenses out to different customers on a non-exclusive basis pursuant to AVS's Master Licensing, Development & Distribution Agreements.

4.      Pursuant to the strict terms of AVS' Master Licensing, Development & Distribution Agreements,  Authorized AVS customers have the right to use this software.  No use of that software is allowed without the prior authorization of AVS.

Page **1** of **9**

5. On or about July 9, 2003, AVS entered into a Master Licensing, Development & Distribution Agreement to sublicense OpenViz to a company called Symyx Technologies, Inc. ("Symyx"). A copy of this agreement is attached hereto as Exhibit A. Pursuant to this agreement, Symyx agreed to pay AVS an annual fee that provided for increases tied to revenue generated from Symyx applications containing the AVS software.

6. On or about July 1, 2010, Symyx became known as Accelrys, Inc. ("Accelrys") through a sale of all of Symyx's assets to Accelrys. As part of this transaction, AVS agreed to an assignment of the Symyx Master Licensing, Development & Distribution Agreement to Accelrys. This assignment was completed by an amendment to the Master Licensing, Development & Distribution Agreement. A copy of this assignment agreement is attached hereto.

7. On or about June 27, 2013, with the consent of AVS, Accelrys assigned its rights under the Symyx Master Licensing, Development & Distribution Agreement to a company called Freeslate, Inc. ("Freeslate"). This assignment was completed by an amendment to the Master Licensing, Development & Distribution Agreement. A copy of this amendment is attached hereto as Exhibit C.

8. Pursuant to the June 29, 2013 amendment, Freeslate agreed to pay AVS an annual fee that provided for increases tied to revenue generated from Freeslate's applications created with or containing the AVS software.

9. On May 22, 2015, Freeslate inquired to AVS about ceasing using the software for development, but continuing to use it for deployment or distribution. AVS responded to this inquiry on May 22, 2015, and indicated that Freeslate did have the right to execrcise an option and pay a fee to do this pursuant to the Master Licensing, Development & Distribution Agreement. Freeslate never exercised this option. .

10. On April 14, 2016, Freeslate indicated that it was no longer using the AVS software for development purposes. A copy of that email is attached hereto as Exhibit C. At no time did Freeslate exercise the option to use the AVS software for deployment or distribution purposes or pay the fee for such use. As such, Freeslate ceased the use of the AVS software for any purpose whatsoever

11. AVS reasonably relied upon the representation made by the Freeslate April 14, 2016 notification, and AVS subsequently stopped receiving fees from the sublicense.

12. On June 4, 2025, AVS received a support inquiry from Shashi Kamath, the Senior Director of Software Engineering for Unchained Labs. A copy of this conversation is attached hereto as Exhibit D.

13. The June 4, 2025 email from Shashi Kamath indicated that Unchained Labs was updating a legacy software application which was using the AVS/OpenViz software version 2.6, and that Unchained Labs needed an update to that software to support a customer. This was the same software that AVS sublicensed to Freeslate.

14. After the June 4, 2025 email from Shashi Kamath, AVS learned that in February, 2016, that the assets of Freeslate were sold to Unchained Labs, and this sale apparently included applications that were created with or containing the AVS software.

15. On June 5, 2025, Mr. Kamath was asked by Anoop Chatterjee, the Chief Technical Officer of AVS, to detail any development or deployment of the Unchained Labs software application embedding the AVS Openviz software since 2016. Mr. Kamath indicated that this software was embedded in an Unchained Lab's software application called PolyView, and that the software did get deployed as part of a software package called LEA. Mr. Kamath also admitted that OpenViz was used to show 2D/3D data in that application and that Unchained Labs had customers that were using this application. A copy of these emails are attached hereto as Exhibit E.

16. Mr. Kamath also emailed a file that contained the licensing information that he was relying upon for Unchained Labs use of the software. This information pertained to the Freeslate sublicense agreement. A copy of this email is attached hereto as Exhibit F.

17. The email attached hereto as Exhibit F was also copied to a former Freeslate employee that was now part of Unchained Labs. This employee was described as the original license holder of the AVS software from Freeslate.

18. The revelations made by Mr. Kamath came as complete surprise to AVS.

Page **3** of **9**

AVS did not have any relationship with Unchained Labs and it had not sublicensed or authorized that company to use that software. AVS also never agreed to any assignment of the rights (or notice of such assignment) to use the AVS software by Freeslate to Unchained Labs, as would have been required by the Master Licensing, Development & Distribution Agreement.

19.     AVS responded to these communication with Mr. Kamath by indicating that Freeslate had terminated its use of the software, and Unchained Labs had no agreement or right to use that software. A copy of this email is attached as Exhibit G.

20. Subsequent to the email attached hereto as Exhibit G, AVS had discussions with Unchained Labs about Unchained Labs purchasing a license to use Open Viz from AVS.

21.     During the discussions described in Paragraph 20, Mr. Chatterjee asked Mr. Kamath why Unchained Labs had not paid AVS for its prior use of the AVS software. Mr. Kamath responded to this inquiry by indicating that Unchained Labs routinely acquired software and uses it without verifying if it has the authority to do so. Mr. Kamath further indicated that Unchained Labs uses that software, and when there is an issue, it contacts the company for support. He stated in many cases, the company no longer exists and Unchained Labs continues on using the software.

22. AVS responded to the above communications by requesting that Unchained Labs compensate it for its longstanding unauthorized use of the AVS software.

23.     Unchained Labs responded by indicating that it no longer needed support from AVS, but ignored any response about the continued use of the AVS software.

24.     Unchained Labs has used AVS's OpenViz software intentionally since 2016.

25.     Unchained Labs has used AVS's OpenViz software without AVS's knowledge since 2016.

26.     Unchained Labs has used AVS's OpenViz software without AVS's authorization since 2016.

27. Unchained Labs has used AVS's OpenViz software without compensating AVS for such use since 2016.

28. Unchained Labs has intentionally, secretly, and deceptively used AVS's OpenViz software without authorization and without compensating AVS since 2016.

29. On or about November 20, 2025, AVS sent Unchained Labs a written demand for compensation for Unchained Labs intentional, secret, and deceptive use AVS's OpenViz software without authorization and compensation. This demand was sent pursuant to the provisions of MGL Chapter 93A. A copy of this demand letter is attached hereto as Exhibit H.

30. While Unchained Labs has responded to the AVS demand letter, it has failed to make any reasonable offer of settlement or compromise.

## COUNT I
## COPYRIGHT INFRINGEMENT

31. The Plaintiff realleges and reavers the allegations contained in paragraph 1-30 of the complaint.

32. AVS is the holder of the exclusive rights under the Copyright Act of 1976 (17 U.S.C. Sections 101 et seq, and all amendments thereto) (the "Copy Right Act") to reproduce, distribute, display, or license the reproduction, distribution, and/or display to Open Viz software.

33. Unchained Labs actions constitute willful copyright infringement of the Copyright Act.

34. As a result of the above-described conduct by Unchained Labs, AVS has been damaged in an amount to be proven at trial.

35. By reason of the copyright infringement described above, AVS is entitled to recover the fair value of the unauthorized use of its software and/or the profits made by Unchained Labs in the unauthorized use of its software.

**WHEREFORE,** the plaintiff demands judgment against the defendant for all amounts owed together with attorney fees, interest, and costs thereon.

## COUNT II
## CONVERSION OF SOFTWARE

36. The Plaintiff realleges and reavers the allegations contained in paragraph 1-35 of the complaint.

37. Unchained Labs has wrongfully and intentionally interfered with and committed conversion of AVS' software.

38. As a result of the above-described conduct by Unchained Labs, AVS has been damaged in an amount to be proven at trial.

**WHEREFORE,** The plaintiff demands judgment against the defendant for all amounts owed together with attorney fees, interest, and costs thereon.

## COUNT III
## EQUITABLE RELIEF (AUDIT)

39. The Plaintiff realleges and reavers the allegations contained in paragraph 1-38 of the complaint.

40. Due to the actions of Unchained Labs and its unauthorized use of AVS's software, AVS is entitled to audit the records of Unchained Labs to determine the extent of that use and the revenue that were generated from that use or the use of any software applications that used that software.

**WHEREFORE,** the plaintiff demands that this Court issue a preliminary injunction order that allows plaintiff to complete an Audit of the records of Unchained Labs to determine the extent of the defendants use of the plaintiff's software and the revenue that were generated from that use or the use of any software applications that used that software.

## COUNT IV

## EQUITABLE RELIEF (ACCOUNTING)

41. The Plaintiff realleges and reavers the allegations contained in paragraph 1-40 of the complaint.

42.    Due to the actions of Unchained Labs and its unauthorized use of AVS's software, AVS is entitled to an accounting from the defendant of all revenue that was generated from that use or the use of any software applications that used that software.

**WHEREFORE,** the plaintiff demands that this Court issue a preliminary injunction order that orders the defendant to provide a complete accounting of all revenue that was generated from the defendant's use of the plaintiff's software or the use of any software applications that used such software.

## COUNT V
## EQUITABLE RELIEF (INJUNCTION)

43.    The Plaintiffs reallege and reaver the allegations contained in paragraph 1-42 of the complaint.

44. Unchained Labs is unlawfully using and infringing upon AVS's software rights.

45. Unchained Labs has no authority or right to use AVS's software without its permission.

46. AVS has suffered damaged due to this trespass.

47. AVS will continue to suffer irreparable harm if the Unchained Labs is allowed to continue using the AVS software without AVS's permission.

WHEREFORE, the Plaintiffs request this Honorable Court:

   a. Preliminarily enjoin the Defendant from using AVS's software in any way forthwith;
   b. After a full hearing, permanently enjoin the Defendant from using AVS's software in any way;
   c. grant such further relief as is proper.

## COUNT VI
## UNFAIR AND DECEPTIVE TRADE PRACTICES

48.    Plaintiffs reallege and reaver the allegations contained in paragraph 1-47 of the complaint.

49.    Unchained Labs is engaged in the conduct of a trade or commerce within the meaning of G.L. c. 93A, s. 1 at seq.

50.    On November 20, 2025, AVS sent Unchained Labs a demand letter pursuant to MGL Chapter 93A alleging that Unchained Labs engaged in unfair and deceptive business practices  by intentionally, secretly, and deceptively using AVS's OpenViz software without authorization and without compensating AVS since 2016.

50.    The demand letter requested certain relief, including but not limited to damages for the unauthorized use of AVS's software.

51.    Unchained Labs responded to the demand letter but failed make a reasonable offer of settlement and upon information and belief it continues to wrongfully use AVS's software.

52.   In addition to the failure to make a reasonable settlement offer, the acts and practices by Unchained Labs  as described herein constitute unfair and deceptive acts or practices within the meaning of G.L. c. 93A, s.1, 7 and 11.  Such acts were also willful and knowing and accrued primarily and substantially in the Commonwealth of Massachusetts.

**WHEREFORE,** the Plaintiffs demand that the Court determine the amount of damages sustained by the Plaintiffs and award the Plaintiffs' judgment for either double or

treble the amount thereof, together with reasonable attorney's fees, expenses, and costs thereon pursuant to G.L. c. 93A.

## THE PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY.

RESPECTFULLY SUBMITTED,
Plaintiff
By its attorney,

Joseph J. Brodigan, Jr.
Brodigan And Gardiner, LLP
40 Broad Street
Boston, MA 02109
(617) 542-1871
BBO #558777
Jbrodiganjr@brodiganlaw.com

DATED: June 11, 2026

## VERIFICATION

I, _DAVID MURRAY_ on behalf of Advanced Visual Systems, Inc. do hereby swear and affirm under the pains of penalties of perjury, that I have read this Verified Complaint, the facts contained in this Verified Complaint are true and accurate to the best of my knowledge and belief and that no material facts have been omitted.

Date: 6/11/26

## NOTARY

_Middlesex_, ss.                                    _June 11, 2026_, 2026

On this  day of _June 11_, 2026 before me, the undersigned notary public, personally appeared the above named _David Murray_ _President of Advanced Visual_ Systems, Inc., proved to me through satisfactory evidence of identification, which was a Massachusetts driver's license, to be the Person whose name is signed on the preceding or attached document, and acknowledged to me that he signed it voluntarily for its stated purpose.

Notary Public _Joseph Brodigan_
My commission expires: _3/26/32_



JOSEPH J. BRODIGAN, JR.
NOTARY PUBLIC
Commonwealth of Massachusetts
My Commission Expires
March 26, 2032

# EXHIBIT A

### MASTER LICENSING, DEVELOPMENT & DISTRIBUTION AGREEMENT

This Master Licensing, Development & Distribution Agreement (the "Agreement") is between Advanced Visual Systems Inc., a Delaware corporation ("AVS") and Symyx Technologies, Inc., a Delaware corporation, and its wholly-owned subsidiary Symyx Discovery Tools, Inc., a California corporation (collectively, "Customer"). The Agreement governs all transactions between AVS and Customer. The following Addendums, when signed by Customer and AVS are incorporated in this Agreement by reference and shall be governed by the terms of this Agreement:

> Addendum A:    AVS Software and Fee Schedule
> Addendum B:    Customer Support

PURPOSE OF AGREEMENT. AVS has developed, distributes, and will continue to develop and distribute AVS Software as described below. Upon payment of applicable fees and subject to the terms of this Agreement and the applicable addenda, a Customer will be entitled to use the object code form of AVS Software during the Term of this Agreement, and to develop and distribute its own applications using AVS Software, and to receive support for the AVS Software.

2.    DEFINITIONS.

2.1    "AVS Software" means the commercially available computer software in object code form provided by AVS and described in Addendum A, including all associated documentation, as well as any updates or upgrades (including without limitation Internal Improvements, as defined in Section 7.1(c)) provided under Addendum B.

2.2    "Customer Seat Application" means a software product developed, marketed, and supported by Customer consisting of an integrated combination of (i) certain components of the AVS Software and (ii) software developed and supported by Customer as described in Addendum A. Customer must have added substantial value to the AVS Software when creating the Customer Seat Application, such that the portion of the value of the Customer Seat Application consisting of AVS Software is less than 50% of the total value of the Customer Seat Application. Customer Seat Application must be a product targeted for a vertical market and cannot be sold or marketed as a general purpose visualization or development product. Customer Seat Application includes all documentation relating specifically to the Customer Seat Application.

2.3    "Customer Server Application" means a software application developed and supported by Customer consisting of an integrated combination of (i) certain components of the AVS Software and (ii) software developed and supported by Customer as described in Addendum A. Customer must have added substantial functionality to the AVS Software when creating the Customer Server Application, such that the portion of the functionality of the Customer

*FC*

Server Application consisting of AVS Software is less than 50% of the total functionality of the Customer Server Application.

Customer Server Applications can be accessed and viewed by End Users only in read-only format, and distributed via file, Web or application server, and cannot be modified by the End User.

2.4 "End User" means a licensee of Customer Seat Application or a Customer Server Application who is authorized pursuant to the terms of this Agreement to use AVS Software.

2.5 "Subdistributor" means a distributor that is part of Customer's customary distribution channels, and that distributes Customer Seat Application.

3. LICENSE.

3.1 Permitted Uses. AVS hereby grants to Customer a non-exclusive, non-transferable, worldwide license during the Term of this Agreement, subject to Customer's compliance with the terms and conditions of this Agreement and payment of the applicable fee(s) to:

A. Use such number of copies of AVS Software as are set forth on Addendum A.

B. Make one copy of the AVS Software for back-up purposes and such other copies as are expressly permitted herein.

C. Develop Customer Seat Applications or Customer Server Applications as set forth on Addendum A using the AVS Software.

D. Sublicense and distribute the AVS Software to the extent it is incorporated in the Customer Seat Application Software, as more fully described in Section 3.3 below.

E. Provide read-only access to the AVS Software to the extent it is incorporated in a Customer Seat Application or Customer Server Application.

3.2 Fees. Customer shall pay AVS the fees set forth on Addendum A with respect to the following license components:

A. Internal use of AVS Software for application development as permitted in Sections 3.IA and 3.IC of this Agreement.

B. Distribution and deployment of each copy of Customer Seat Application licensed pursuant to Section 3.1 D of this Agreement and/or each Customer Server Application made available to End Users

2

pursuant to Section 3.1 E of this Agreement.

C.   Maintenance and support of AVS Software pursuant to the terms of Addendum B of this Agreement.

3.3   <u>Sublicense/Distribution and Deployment Rights</u>. Customer's rights to sublicense and distribute to End Users the AVS Software contained in Customer Seat Applications or to deploy Customer Server Applications shall be subject to the following restrictions:

A.   Customer may distribute Customer Seat Applications solely to End Users and/or to Subdistributors.

B.   Customer shall have no right to (i) distribute AVS Software directly or indirectly, except as integrated into Customer Seat Applications in object code form, or (ii) otherwise to deploy AVS Software directly or indirectly, except as integrated into a Customer Server Application in read-only format, in each case pursuant to the terms of this Agreement. Customer shall not knowingly distribute or otherwise make available Customer Seat Applications or Customer Server Applications to End Users who intend to use the AVS Software contained in the Customer Seat Applications or Customer Server Applications to run applications other than those provided in such Customer Seat Applications or Customer Server Applications.

C.   Customer shall safeguard AVS's proprietary rights in the AVS Software and all copies of the AVS Software incorporated in Customer Seat Applications and Customer Server Applications with at least the same protections as it provides for its own proprietary information, including, without limitation, by causing each Subdistributor and End User to sign a sublicense agreement prior to receipt of Customer Seat Applications or by distributing the Customer Seat Application with an enforceable shrink-wrap, click-wrap or similar license, containing, at a minimum, the following prohibitions:

1)   No copying (except for back-up purposes).
2)   No disassembling, decompiling or reverse engineering.
3)   No removal of AVS copyright notices.

D.   Customer may directly or through a fulfillment provider make copies of the AVS Software solely to the extent necessary to create copies of Customer Seat Applications or Customer Server Applications to sublicense to End Users and Subdistributors as permitted herein.

E.   Customer agrees that Customer Seat Applications and Customer Server Applications shall not, under any circumstances, include the file "developer.jar" for JAVA applications.

3

F.    If Customer ceases to pay use/development fees under this Agreement, but continues to pay distribution/deployment fees according to the provisions of Addendum A to this agreement or AVS' then-prevailing fee schedule, Customer shall retain the right

to (i) sublicense and distribute the AVS Software solely as integrated into the then-extant versions of Customer Seat Applications, or (ii) provide network access to then-extant versions of the Customer Server Applications, as the case may be. However, Customer shall have no further right to use the AVS Software to develop new Customer Seat Applications or Customer Server Applications and no right to sublicense or distribute the AVS Software as part of any new Customer Seat Application or Customer Server Application.

G.    Notwithstanding anything in this Agreement to the contrary, Symyx shall be allowed to distribute the Symyx Renaissance® Software Developer's Kit, incorporating AVS OpenViz (as defined in this Agreement), to End Users.

3.4    Limitations on use. This Agreement does not grant to Customer any right to copy AVS Software except as expressly provided herein. Customer may not reverse engineer, reverse compile, or otherwise attempt to recreate the source code version of the AVS Software. Customer may not sublicense, distribute or deploy AVS Software except as expressly provided in Sections 3.1 D, 3.IE and 3.3. The AVS Software constitutes "restricted rights" software for purposes of government contracting and subcontracting.

3.5    Delivery. AVS will use its best efforts to ship within thirty (30) days of its acceptance of Customer's order. Customer shall pay all costs of shipping. Delivery will be FOB AVS's plant or manufacturing source, at AVS's option. In the absence of prior shipping instructions, AVS will select the carrier on behalf of Customer, but shall not assume any liability for shipment or choice of carrier, nor shall the carrier be construed to be an agent of AVS. AVS may, in its sole discretion, provide Customer with the option to download the AVS Software.

4.    PAYMENT. Unless otherwise provided in Addendum A, Customer shall pay all amounts due under this Agreement in United States dollars to the address specified on each AVS invoice, within thirty (30) days from the date of invoice. AVS may charge interest on overdue amounts at the rate of 1.5% per month or the highest lawful rate, whichever is less. Customer shall be responsible for all taxes incurred with respect to AVS deliverables, except those taxes based on AVS's income or payroll.

5.    TERMS AND TERMINATION.

5.1 <u>Term of Agreement</u>. This Agreement shall commence on the date identified on Addendum A of this Agreement ("Effective Date") and shall continue for the term indicated upon Addendum A.

5.2 <u>Termination for Breach</u>. If any material breach of this Agreement (including, without limitation, Customer's nonpayment of fees due hereunder) by either party continues after thirty days' written notice of the breach to the other party, the party giving notice may terminate this Agreement immediately. Notwithstanding the foregoing, AVS shall have the right to terminate this Agreement immediately if Customer is in breach of the provisions of Sections 3.3, 3.4 or 9 hereof.

5.3 <u>Termination for Bankruptcy</u>. This Agreement shall terminate if Customer files a petition for bankruptcy or has an involuntary petition filed on its behalf, and the petition is not terminated or dismissed within sixty (60) days. AVS may also terminate this Agreement upon Customer's dissolution, liquidation, assignment for the benefit of creditors, or the appointment of a receiver, trustee, custodian, or similar agent for Customer's business or property.

5.4 *Intentionally Omitted.*

5.5 <u>Obligations on Termination.</u> Upon termination of this Agreement for any of the foregoing reasons:

A. Each party shall continue to be responsible for safeguarding the other's proprietary and/or confidential information in accordance with the terms of this Agreement (subject to the provisions of clause (E) below).

B. Each party shall erase, destroy or delete, or return to the other any of the other party's proprietary and/or confidential information in its possession. If requested, the other party shall verify in writing to the requesting party within thirty (30) days that the requesting party's proprietary and/or confidential information has been returned, destroyed, deleted or erased.

C. If Customer has developed Customer Seat Applications or Customer Server Applications as described in Section 3.1, Customer may continue to sublicense and distribute, or deploy (as applicable), the AVS Software contained therein so long as Customer continues to pay the Fees described in Section 3.2 (subject to any Consumer Price Index increase adjustments under the Fee Schedule included in Addendum A, as applicable). Otherwise, Customer shall immediately discontinue all use, sublicense, distribution and deployment (if applicable) of the AVS Software in its possession (including any copies placed in any storage device under Customer's control) and shall return or destroy all copies in its control subject to the provisions of subsection 5.5E of this Agreement.

5

D.  Upon termination of this Agreement, if Customer has distributed Customer Seat Applications or Customer Server Applications pursuant to Sections 3.1 and 3.3 of this Agreement, End Users shall be permitted the continued and uninterrupted use of the Customer Seat Application for the balance of the term of the applicable sublicense agreements, provided that all amounts owed to AVS under the terms of this Agreement are fully paid.

E.  Customer and each Subdistributor (if applicable) shall have the right to retain one copy of the AVS Software with respect to which

Customer has any sublicense agreement currently outstanding and may use such AVS Software solely to the extent required for support and maintenance under outstanding sublicense agreements in effect at termination. Customer and Subdistributors shall have no other right to use such copies of the AVS Software, or to sublicense or otherwise distribute products incorporating the AVS Software, or have any other rights with respect to the AVS Software.

F.  Customer shall cease all development of Customer Seat Applications and/or Customer Server Applications, and any revisions, enhancements or updates thereof that are based on AVS Software.

5.6  Survival. The provisions of this Agreement related to payment and confidentiality, and the other provisions of this Agreement, which by their nature are so intended, shall survive any termination of this Agreement.

6.  LIMITATION OF LIABILITY.

6.1  IN NO EVENT WILL EITHER PARTY BE RESPONSIBLE FOR ANY INCIDENTAL, SPECIAL, CONSEQUENTIAL, OR OTHER INDIRECT DAMAGES OR FOR ANY DAMAGES RESULTING FROM INACCURATE OR LOST DATA OR LOSS OF USE OR LOST PROFITS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, THE USE OR PERFORMANCE OF THE AVS SOFTWARE, OR ANY SERVICES PERFORMED BY AVS, WHETHER IN AN ACTION IN CONTRACT, TORT, OR IN ANY OTHER CAUSE OF ACTION OR ANY CLAIM FOR INFRINGEMENT. IN NO EVENT WILL AVS' TOTAL LIABILITY FOR ANY DAMAGES IN ANY ACTION BASED ON OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT (EXCEPT FOR A MATERIAL BREACH OF ARTICLE 9, FOR WHICH NO LIMITATION OF LIABILITY SHALL EXIST) EXCEED THE TOTAL AMOUNT PAID TO AVS BY CUSTOMER DURING THE PRECEDING 12-MONTH PERIOD FOR THE PRODUCT OR SERVICE FORMING THE BASIS FOR THE ACTION.

6

7.    WARRANTIES AND LIMITATIONS.

7.1    Warranties. AVS warrants to Customer that the AVS Software, as delivered by AVS to Customer and properly installed and operated on the computer system on which the AVS Software was intended to operate, will perform substantially as described in available documentation for sixty (60) days from the date of delivery (the "Warranty Period"). During the Warranty Period, if the AVS Software fails to so perform, Customer shall promptly notify AVS of, and adequately describe and re-create the failure, and Customer's exclusive remedy and AVS' sole obligation shall be to take the following actions:

A.    AVS will provide telephone or e-mail assistance to the Customer to resolve the problem during the non-AVS holiday period of Monday through Friday, 9:00 a.m. - 5:30 p.m. in the time zone

indicated upon Addendum B, and will make reasonable efforts to provide work-arounds and/or corrections for the reported problems in the affected copy of AVS Software; or,

B.    If such problem resolution is not successful, terminate the license and refund all license fees paid for the applicable copy of AVS Software.

C.    In addition, during the Warranty Period and while Customer is current in any support fees due hereunder, AVS will supply bug fixes ("Internal Improvements") to Customer as they become generally available. Only one set of Internal Improvements will be provided per customer unless otherwise specified in Addendum B.

7.2    Limitations. Because the AVS Software is complex, AVS does not warrant that the AVS Software is error-free or that its use will be uninterrupted. AVS shall not be obligated to remedy any AVS Software defect that cannot be adequately repeated. The warranties set forth in Section 7.1 do not apply to any AVS Software which (i) has been altered, except by AVS or in accordance with AVS-produced documentation, (ii) has been used in conjunction with another vendor's product, resulting in the defect, (iii) is other than the most current version of the AVS Software (to the extent that any failure of the AVS Software would have been avoided by the use of the most current version) or (iv) has been damaged by improper environment, abuse, misuse, accident or negligence. The warranties set forth in Section 7.1 do not apply to, and AVS specifically disclaims all warranties concerning, AVS Software identified as alpha or beta test versions, or as unsupported or discontinued versions; such AVS Software is furnished on as "as-is" basis only.

A.    SUBJECT TO THE PROVISIONS OF PARAGRAPH 6, THE FOREGOING WARRANTIES ARE EXCLUSIVE REMEDIES AND

7

ARE IN LIEU OF ALL OTHER REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE, INCLUDING WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

B.    No statement, including without limitation, representations regarding capacity, suitability for use, or performance of AVS Software, whether made by AVS's employees or otherwise, shall be deemed to be a warranty by AVS for any purpose or to give rise to any liability of AVS unless contained in this Agreement. AVS's warranty in Section 7.1 is for the benefit of Customer only. Customer may not grant, assign or otherwise transfer AVS's warranty to any other person or entity. AVS MAKES NO OTHER WARRANTY OF ANY KIND TO CUSTOMER OR TO ANY OTHER PARTY.

8.    CLAIMS OF INFRINGEMENT.

8.1    Indemnification by AVS

A.    Indemnification. AVS shall indemnify and hold Customer harmless from and against, and shall defend, any claim, suit or proceeding (an "action"), and pay any settlement amounts or damages awarded by a court of competent jurisdiction, arising out of claims by third parties that the AVS Software or any other AVS deliverable provided under this Agreement ("Deliverable") infringes any United States copyright, patent, trademark or trade secret, provided that Customer (i) notifies AVS promptly in writing of the action, (ii) provides AVS with reasonable information, cooperation and assistance in the defense or settlement of the action (at AVS' expense), and (iii) grants AVS sole authority and control of the defense or settlement of the action, subject to Customer's written consent of any proposed settlement, which shall be required solely if the terms of settlement are not confidential between the parties, and shall not be unreasonably withheld or delayed. Customer shall have no authority to settle any action on behalf of AVS, and no costs or expenses shall be incurred for the account of AVS without its prior written consent.

B.    Limitation of AVS Indemnification. AVS shall have no liability to Customer to the extent the infringement or claim thereof is the result of (i) use of the AVS Software or deliverables in combination with other products, devices or software which are not furnished to Customer by AVS, if the infringement would not have occurred but for the combination; (ii) modification of the AVS Software or deliverables by other than AVS, or (iii) use of other than a current unaltered version of the AVS Software or deliverables, if such infringement would have been avoided by use of the current unaltered version of the AVS Software or Deliverable. In the case of any services, this

8

indemnification shall not apply to deliverables based on specifications created by Customer or to deliverables that, in the absence of software or equipment provided by Customer, would not infringe the intellectual property rights of the affected party.

C.    Remedies for AVS Infringement. Should the AVS Software or deliverables become, or in the opinion of AVS be likely to become, the subject of a claim of such an infringement, then AVS shall (in addition to indemnifying Customer as provided in Section 8.1(a)), at its option and expense, either (i) procure for Customer the right to use the AVS Software or deliverables, or (ii) replace or modify the AVS Software or deliverables to make it non-infringing but otherwise substantially confirming to the description in Addendum A and any documentation provided therewith, or (iii) if the options described in clauses (i) and (ii) are not commercially practical, accept the return of the AVS Software or deliverables (or the infringing part thereof), terminate the licenses granted hereunder, and grant to Customer a refund either for the AVS Software or, in the case of services, for the time charged to the Customer for the infringing deliverables.

8.2    Indemnification by Customer.

A.    Indemnification. Customer shall indemnify and hold AVS harmless from and against, and shall defend, any claim, suit or proceeding (an "action"), and pay any reasonable attorneys fees and settlement amounts or damages awarded by a court of competent jurisdiction, arising out of claims by third parties that the Customer Seat Application or any Customer Server Application infringes any United States copyright, patent, trademark or trade secret, provided that AVS (i) notifies Customer promptly in writing of the action, (ii) provides Customer with reasonable information, cooperation and assistance in the defense or settlement of the action (at Customer's expense), and (iii) grants Customer sole authority and control of the defense or settlement of the action, subject to AVS's written consent of any proposed settlement, which shall be required solely if the terms of settlement are not confidential between the parties, and shall not be unreasonably withheld or delayed. AVS shall have no authority to settle any action on behalf of Customer, and no costs or expenses shall be incurred for the account of Customer without its prior written consent.

9

B.    <u>Limitation of Customer Indemnification.</u> Customer shall have no liability to AVS to the extent the infringement or claim thereof relates to the AVS Software incorporated in the Customer Seat Application or Customer Server Application. IN NO EVENT WILL CUSTOMER'S TOTAL LIABILITY UNDER SECTION 8.2 (EXCEPT FOR A MATERIAL BREACH OF ARTICLE 9, FOR WHICH NO LIMITATION OF LIABILITY EXIST) EXCEED THE TOTAL AMOUNT PAID TO AVS BY CUSTOMER DURING THE PRECEDING 12-MONTH PERIOD PURSUANT TO THIS AGREEMENT.

8.3    <u>Entire Liability</u>. SECTION 8 OF THIS AGREEMENT STATES THE ENTIRE LIABILITY OF AVS AND CUSTOMER WITH RESPECT TO CLAIMS OF INFRINGEMENT RELATING TO (i) AVS' PROVISION OF SERVICES OR AVS SOFTWARE OR ITS USE OR OPERATION, AND (ii) ANY CUSTOMER SEAT APPLICATION OR CUSTOMER SERVER APPLICATION.

9.    <u>CONFIDENTIALITY</u>.

9.1    <u>Confidential Information</u>. The parties agree not to permit access to or to disclose the other party's Confidential Information except to its authorized employees and contractors who are bound by confidentiality agreements and who need to use or have access to the other party's Confidential Information as permitted by this Agreement. A party shall use at least the same degree of care in protecting the other party's Confidential Information as such party generally exercises in protecting its own most valuable proprietary information, but not less than reasonable care, and shall inform its employees having access to the Confidential Information of its confidential nature. "Confidential Information" includes all software, code, documentation, specifications, drawings, documents, data, and other information provided by one party to the other and relating to the providing party's business and operations, including, without limitation, information disclosed orally, or visually where indicated to be confidential prior to disclosure and thereafter summarized and marked as confidential in a written memorandum delivered to the receiving party within thirty (30) days of the disclosure, as well as information clearly identified as "Confidential" or "Proprietary", or marked with a similar legend. However, the receiving party shall have no obligation of confidentiality with respect to any Confidential information which: (a) is already known to the receiving party at the time of disclosure; (b) is or subsequently becomes publicly available through no wrongful act of the receiving party; (c) is disclosed to or provided to the receiving party by an unrelated third party without violation of any obligation to the disclosing

10



party; (d) is developed independently by the receiving party without use of or access to the disclosing party's Confidential Information; or (e) is required by law to be disclosed (provided that the receiving party promptly notifies the disclosing party and allows the disclosing party a reasonable time to oppose such legal requirement).

9.2   Public Relations. Customer and AVS agree to reasonably support each other in public relations and marketing efforts including, without but not limited to press releases, product announcements, case studies and customer references. Each party agrees to obtain the prior written consent of the other prior to publicly releasing any such effort. Customer consents to AVS' use of Customer's name and logo as a user of AVS Software, subject to Customer's prior written approval of any intended use and provided that all goodwill associated with Customer's name and logo will at all times remain the sole property of Customer.

10.   GENERAL

10.1   Governing Law. This Agreement shall be governed in all respects by the laws of the State of Delaware without giving effect to principles of conflict of laws. The United Nations Convention for the International Sale of Goods shall not apply to this Agreement.

10.2   Notices. All notices or reports shall be in writing and shall be delivered by personal delivery, facsimile transmission, or by certified or registered mail, return receipt requested, and shall be deemed given upon personal delivery, five days after deposit in the mail, or upon acknowledgment of receipt of electronic transmission. Notices shall be sent to the addresses set forth on Addendum A or to such other address as either party may specify in writing.

10.3   No Agency. The parties are independent contractors. Nothing contained in this Agreement shall be construed as creating any agency, partnership, or other form of joint enterprise between the parties.

10.4   Injunctive Relief. Customer acknowledges that its breach of Sections 3.3, 3.4, 5.5 or 9 of this Agreement may cause AVS irreparable damage for which recovery of money damages would be inadequate. AVS acknowledges that its breach of Section 9 of this Agreement may cause Customer irreparable damage for which recovery of money damages would be inadequate. Therefore, each party agrees that the other party shall be entitled to seek injunctive relief to protect its rights under such sections of this Agreement in addition to any other remedies available to it.

10.5   Force Majeure. Neither party shall be liable to the other for any failure or delay in the performance of its obligations (except for the payment of money) caused by strikes, embargoes, unexpected government requirements, civil or military authorities, or by the public enemy or for any similar cause that is

11

beyond the reasonable control of such party.

10.6 Waiver. If one party fails to enforce a provision of this Agreement, it shall not be precluded from enforcing the same provision at another time.

10.7 Severability. If any provision of this Agreement is deemed unenforceable or invalid by law or by a court decision, the provision shall be changed and interpreted if possible to accomplish the intent of the provision within the constraints of the law. Only that provision, and not the entire agreement, shall be invalidated.

10.8 Assignment. Customer shall not assign this Agreement or any rights hereunder, except by operation of law or change of control, without the prior written consent of AVS, which consent shall not be unreasonable withheld. AVS shall notify Customer whether it consents to a proposed assignment within ten (10) business days of receipt from Customer of notice of its intention to assign, together with information on the factors set forth below. Any purported assignment without required consent shall be void and of no effect. In determining whether to consent to a proposed assignment by Customer, AVS shall act in good faith and shall consider factors such as the financial capability of the proposed assignee and whether the potential assignee competes with AVS. AVS may assign this Agreement without restriction. Any permitted assigns or successors shall be bound by all terms and conditions of this Agreement.

10.9 No Conflicting Terms. AVS shall not accept, and this Agreement does not operate as an acceptance of, any different or additional terms and conditions, and this Agreement shall prevail over any such different or additional provisions, of any order of Customer or any other instruments.

10.10 Entire Agreement. This Agreement supersedes all previous agreements, whether oral or written, with respect to its subject matter. This Agreement may only be changed in a writing signed by authorized representatives of each party.

10.11 Export. Customer acknowledges that the export or re-export of the AVS Software to certain countries, to certain persons, and/or for certain end-users, may be subject to the export control laws, regulations and requirements of the United States and third countries. Regardless of any disclosure made by Customer regarding its activities with respect to AVS Software, Customer shall abide by all laws, regulations and requirements of the United States and third countries and shall not export or re-export, directly or indirectly, any AVS Software without first obtaining all necessary export licenses or other approvals required under the laws, regulations and requirements of the United States and third countries.

10.12 Authorization. Each party represents that the individual signing below is

authorized to enter into this Agreement and to create a legally binding agreement on behalf of such party, executed as an instrument under seal, as of the date set forth below.

ADVANCED VISUAL SYSTEMS INC.    SYMYX TECHNOLOGIES, INC.

By: _____    By: _____

Print Name: FRED C. CARTWRIGHT    Print Name: Isy Goldwasser

Title: V.P. NORTH AMERICAN SALES    Title: President & COO

Date: 07/09/03    Date: 07/09/03

SYMYX DISCOVERY TOOLS, INC.

By: _____

Print Name: Jerry L. Hileman

Title: CFO

Date: 07/09/03

13

**ADDENDUM A**

**AVS Software and Fee Schedule**

This Addendum, along with the Agreement into which it is incorporated by reference, defines specific terms and conditions as set forth in the Agreement.

1.  **AVS SOFTWARE.**

    1.1  "Open Viz Engine" meaning proprietary AVS Software code in object form constituting an infrastructure for generating and adding interactive visualization to a software application.

    1.2  "Open Viz Components" meaning data visualization components in object form constituting proprietary AVS Software that provides data access and/or visualization to add behavior to applications.

2.  **CUSTOMER SEAT APPLICATIONS.**

    2.1

3.  **CUSTOMER SERVER APPLICATIONS.**

    3.1

4.  **EFFECTIVE DATE AND TERM.**

    4.1  The Effective Date of this Agreement shall be July 9, 2003.

    4.2  The term of this Agreement shall be for three (3) years from the Effective Date. Thereafter, this Agreement shall be automatically renewed for separate, successive one (1) year periods, unless earlier terminated by either party providing written notice of its intent not to renew at least sixty (60) days prior to the commencement of any such renewal period.

5.  **FEES.**

    5.1  The initial annual fee ("Annual Fee") for internal application development using AVS Software by any number of Customer's employees; distribution of Customer Seat Applications and/or Customer Server Applications to any number of End Users; and support of AVS Software as defined in Addendum B to this Agreement shall be $ 60,000.

    5.2  The Annual Fee shall be payable in full as of the Effective Date of this Agreement and upon each successive anniversary of the Effective Date while this Agreement is in effect, and subject to increase based upon the following fee schedule ("Fee Schedule"):

14

Net Revenue (defined as Gross Revenues of Customer less credits, returns, shipping charges, sales taxes, withholding taxes to the extent Customer does not benefit from credits relating to such Withholding Taxes as shown on the consolidated U.S. tax returns of Customer as filed, and custom duties, as converted into U.S. dollars, if applicable, using the rate published in the Wall Street Journal at the anniversary of each Effective Date) derived from and attributable solely to the stand-alone license of Customer Seat Applications and Customer Server Applications containing AVS Software sold during each twelve (12) months during the Term of this Agreement commencing with the first anniversary of the Effective Date:

Annual Fee payable by Customer to AVS, as converted into U.S. dollars, if applicable, using the rate published in the Wall Street Journal at each anniversary of the Effective Date:

| | |
|---|---|
| $0 to $3,000,000 | $60,000 |
| $3,000,001 to $10,000,000 | $90,000 |
| $10,000,001 to $20,000,000 | $150,000 |
| $20,000,001 to $100,000,000 | $220,000 |
| Greater than $100,000,001 | $300,000 |

For purposes of this Agreement, Gross Revenues of Customer shall be defined as revenue derived by Customer from and expressly attributable to the license to third parties of Customer Seat Applications and Customer Server Applications containing AVS Software. Gross Revenues of Customer for the purpose of this Agreement specifically excludes:

(a) revenue derived by Customer from the sale of Discovery Tools® Systems, notwithstanding that Customer Seat Applications and Customer Server Applications licensed in conjunction with the sale of such Discovery Tools Systems may contain AVS Software;
(b) revenue derived by Customer for undertaking research and development contracts, notwithstanding that in conducting the Research and Development services and reviewing the results of such services, employees, consultants or contractors of Customer, and/or End Users may use Customer Seat Applications and Customer Server Applications containing AVS Software; and
(c) revenue derived by Customer as milestone, royalties, technology access fees, intellectual property licensing fees and research and development success fees;

In the event that Customer Seat Applications and Customer Server Applications containing AVS Software are licensed to third parties in conjunction with Customer's other software products or applications that do not contain AVS Software, or are bundled together with implementation, integration, support or other such services, then Customer will perform a reasonable allocation of the revenue derived from such transactions, such that Gross Revenues of Customer for the purpose of this

15

Agreement will only include that portion of revenue derived by Customer from the license of Customer Seat Applications and Customer Server Applications containing AVS Software

5.3 If, after the first anniversary of the Effective Date, Customer, for any reason, ceases development of Customer Seat Applications and Customer Server Applications, customer shall retain the right to sublicense and distribute AVS Software solely as integrated into the then-extant versions of Customer Seat Applications and Customer Server Applications for advance payment of sixty-five percent (65%) of the Annual Fee as would be payable using the Fee Schedule.

5.4 To ensure compliance with the terms of this Agreement, AVS shall have the right, not more than once per year and upon thirty (30) days notice, to have an inspection and audit of all the books and records of Customer, conducted by an independent certified public accountant reasonably acceptable to both parties, whose fee is paid by AVS. Such audit shall be conducted during regular business hours at Customer's offices and in such a manner as not to interfere with Customer's normal business activities. Customer will promptly pay AVS any amounts determined to have been underpaid.

5.5 The Annual Fee paid in the first year of this Agreement entitles Customer to five (5) days of eight (8) hours each of training in the use of the AVS Software, subject to the following terms and conditions:

A. A prescribed training syllabus is followed for the first three(3) days of the training course. The content of final two (2) days of the training may be defined in advance of the training in consultation with AVS.

B. AVS will provide the training in accordance with generally accepted industry standards. If an AVS employee or subcontractor providing training under this Addendum is unable to complete the task (for example, due to sickness or resignation), AVS will use its commercially reasonable efforts to provide another employee or subcontractor of similar experience to fulfill the contract.

C. Customer shall reimburse AVS for all reasonable travel, accommodation, subsistence and other expenses incurred by AVS in connection with the performance of training services.

D. For a period of one (1) year after AVS has completed the Services, each of AVS and Customer agrees that it will not, directly or indirectly, solicit, interfere with or try to entice away any employee of the other party.

16

6.    NOTICES.

    6.1    To AVS:    Advanced Visual Systems Inc.
                                        300 Fifth Avenue
                                        Waltham, MA 02451
                                        Tel: (781) 890-4300
                                        Fax: (781) 890-8287
                                        Email: info@AVS.com

    6.2    To Customer:    Symyx Technologies Inc.
                                          3100 Central Expressway
                                        Santa Clara, CA 95051
                                        Tel: (408) 764-2000
                                        Fax: (408) 748-0175

                                        With copies to:

                                        Symyx Discovery Tools, Inc.
                                        1263 East Arques Ave
                                        Sunnyvale, CA 94085
                                        Tel: (408) 764-2000
                                        Fax: (408) 748-0175

                                        and
                                        Vice President, Alliances and Legal Affairs

This Addendum is incorporated into and made a part of the Agreement between AVS and Customer, and is subject to the terms thereof.

ADVANCED VISUAL SYSTEMS INC.    SYMYX TECHNOLOGIES INC.

By: _____    By: _____

Print Name: FRED C. CARTWRIGHT    Print Name: Isy Goldwasser

Title: V.P. North American Sales    Title: President & COO

Date: 07 / 09 / 03    Date: 07/09/03

                                          SYMYX DISCOVERY TOOLS, INC.

                                        By: _____

                                        Print Name: Jerry L. Hillman

                                        Title: CFO

17

Date: ___07/09/03___

18

FC

## ADDENDUM B
## Customer Support

This Addendum, along with the Agreement into which it is incorporated by reference, addresses AVS' maintenance and support obligations after expiration of the warranty period as set forth in the Agreement.

SUPPORT SERVICES.

1.1    AVS agrees to provide maintenance and support services for the current version and one prior version of AVS Software licensed under this Agreement, as utilized in association with the Customer Seat Applications and/or Customer Server Applications specified in Addendum A to this Agreement. Specific services are described in the support program description provided to Customer and incorporated herein by reference.

1.2    Telephone and/or e-mail support services ("Support") will be available during AVS' normal business hours of Monday through Friday, 9:00 a.m. to 5:30 p.m. Eastern time, excluding holidays observed by AVS, which will be substantially consistent with prevailing U.S. business practices.

1.3    Support shall be provided for the purpose of investigating AVS Software errors that have been reported and documented in writing by Customer. Customer shall submit to AVS a listing of output, code, a clear description of the problem and error message(s), information regarding the equipment and operating system on which the AVS Software is loaded, and any other data that AVS reasonably may request in order to reproduce the conditions under which the error occurred. AVS will acknowledge to Customer receipt of a reported error and will verify Customer-detected errors, provided that the error can be recreated with an unmodified release of the AVS Software. AVS will use commercially reasonable efforts to develop a work-around for the error.

1.4    Unless otherwise defined in writing as part of Addendum B to this Agreement, Support will be provided according to the following schedule:

| Annual Fee paid by Customer to AVS, as converted into U.S. dollars, if applicable, using the rate published in the Wall Street Journal at the Effective Date and each subsequent anniversary of the Effective Date: | Number of Customer's designated representatives ("Named Support Contacts") who may utilize Support pursuant to the provisions of Addendum B to this Agreement: |
|---|---|
| $0 to $60,000 | 1 |
| $60,001 to $90,000 | 2 |
| $90,001 to $150,000 | 3 |
| $150,001 to $220,000 | 4 |

19

FC



| Annual Fee paid by Customer to AVS, as converted into U.S. dollars, if applicable, using the rate published in the Wall Street Journal at the Effective Date and each subsequent anniversary of the Effective Date: | Number of Customer's designated representatives ("Named Support Contacts") who may utilize Support pursuant to the provisions of Addendum B to this Agreement: |
|---|---|
| $221,000 to $300,000 | 5 |

1.5     Named Support Contacts shall be specified by Customer in writing to support@avs.com. Named Support Contacts will be responsible for reporting any detected errors in the AVS Software to AVS. No other employee or representative of Customer shall be authorized to report any error or partake in Support. AVS shall be under no obligation to respond to any unauthorized reports, which shall include reports provided by any other means than telephone or email to support@avs.com. Customer may change its designated representative upon five (5) days' advance written notice to support@avs.com.

1.6     Customer agrees to cooperate with AVS to the extent necessary for AVS to perform its Support. Such cooperation shall include, but not be limited to, providing AVS with all necessary information requested by AVS personnel. Customer further agrees that before availing itself of Support, it shall attempt to resolve any apparent problem by using the documentation in its possession.

1.7     AVS will be responsible only for supporting AVS Software and not for Customer's own software application. In its sole discretion, AVS may cease providing support services or limit availability of such services to Customers who, in AVS's reasonable judgment, are abusing the customer support system. By way of example and not by way of limitation, such abuse may include excessive requests for assistance unrelated to errors in the AVS Software and lack of cooperation with the reasonable requests of AVS personnel for error documentation.

*[SIGNATURE PAGE FOLLOWS]*

This Addendum is incorporated into and made a part of the Agreement between AVS and Customer, and is subject to the terms thereof.

ADVANCED VISUAL SYSTEMS INC.

By: _____

Print Name: FRED CARTWRIGHT

Title: U.P. North American Sales

Date: 07 / 09 / 03

SYMYX TECHNOLOGIES INC.

By: _____

Print Name: Isy Goldwasser

Title: President & COO

Date: 07/09/03

SYMYX DISCOVERY TOOLS, INC.

By: _____

Print Name: Jerry L Hillman

Title: CEO

Date: 07/09/03

21

# EXHIBIT B

CONFIDENTIAL

## AMENDMENT No. 2
## to MASTER LICENSING, DEVELOPMENT & DISTRIBUTION AGREEMENT

This Amendment ("**Amendment 2**") is made to the Master Licensing, Development and Distribution Agreement and its Amendment (collectively the "**Agreement**") between Advanced Visual Systems Inc., a Nevada Corporation ("**AVS**") and Symyx Technologies, Inc., a Delaware corporation ("**Symyx**"). The effective date of this Amendment is June 29, 2013 (the "Amendment Date").

### Recitals

WHEREAS, AVS and Symyx entered into the Agreement on April July 9, 2003 and amended the Agreement on June 6, 2006 and acknowledge that the Agreement is in full force and effect; and

WHEREAS, Symyx became known as Accelrys, Inc., a Delaware corporation, ("**Accelyrs**") on July 1, 2010 through a sale of all of Symyx' assets to Accelrys; and

WHEREAS Accelrys has licensed certain commercial software products that are recognized as Customer Seat Application(s) and Customer Server Application(s) under the Agreement to Freeslate, Inc., a Delaware corporation ("**Freeslate**"); and

WHEREAS, Accelrys wishes to assign its rights and obligations under the Agreement to Freeslate and Freeslate wishes to accept all rights and obligations from Accelrys; and

WHEREAS, Accelrys wishes to become a Subdistributor of Freeslate and distribute Customer Seat Application(s) and Customer Server Application(s) to End Users as provided under the Agreement, and Freeslate wishes to accept Accelrys as a Subdistributor; and

WHEREAS, AVS wishes continue its business relationship with each of the parties as set forth herein and in the Agreement and modify select provisions as set forth in this Amendment 2; and

NOW THEREFORE, in consideration of their respective promises contained herein, AVS and Accelrys and Freeslate agree as follows:

### Amended Agreement

1.  Customer.    Effective with Amendment Date, the definition of Customer in all future interpretations of the Agreement shall mean Freeslate.

2.  Accelrys.  Accelrys hereby acknowledges that it acquired all of assets and liabilities of Symyx on July 1, 2010 and that it has full right and authority to act on behalf of Symyx in this Amendment with respect to an assignment to Freeslate, and that it has faithfully honored all obligations to AVS under the Agreement since the Effective Date up to and including the Amendment Date and that it shall faithfully honor all obligations to AVS and Freeslate as set forth in the Agreement in its capacity of Subdistributor. Accelrys acknowledges that effective with the Amendment Date that it shall have no right to use the AVS Software except as provided in sections 3.1B, 3.1D, 3.1E, 3.3 A, B, C, D, E and 3.4 of the Agreement. USE OF THE AVS SOFTWARE FOR ANY NEW PRODUCT DEVELOPMENT BY ACCELRYS IS EXPRESSLY PROHIBITED. Furthermore, Accelrys agrees to abide by the provisions of Sections 5.5 and 5.6 in perpetuity and acknowledges that all warranties and Support obligations of AVS shall terminate effective with the Amendment Date.

CONFIDENTIAL

3. <u>Freeslate</u>. Freeslate hereby accepts an assignment of all of the rights and obligations of the Agreement from Accelrys effective with the Amendment Date.

4. <u>AVS</u>. AVS hereby consents to an assignment of the Agreement from Accelrys to Freeslate, as required under section 10.8 of the Agreement.

5. <u>Fees</u>. Section 5 of Addendum A of the Agreement and section 6 of Amendment No. 1 to the Agreement shall be stricken in their entirety and Section 5 of Addendum A shall be replaced with the following:

   5.1. <u>Annual Fee</u>. Provided that payment is received prior to June 30, 2013, the annual fee ("**Annual Fee**") for 2 consecutive years (commencing on the Amendment Date) of distribution of Customer Applications to any number of End Users shall be $70,000. . If payment is not received prior to June 30, 2013 the amounts set forth in the Fee Schedule shall apply.

   5.2. <u>Payment of Annual Fees</u>. The Annual Fee shall be payable in full as of the Amendment Date and upon each successive and applicable anniversary of the Amendment Date while this Agreement is in effect, and subject to increase based upon the following fee schedule ("**Fee Schedule**"):

| "Net Revenue" (defined as gross revenues of Customer less credits, returns, shipping charges, sales taxes, and custom duties, as converted into U.S. dollars, if applicable, using the rate published in the Wall Street Journal at the anniversary of each Amendment Date) derived from Customer Applications created with or containing AVS Software sold during each 12 months during the Term of this Agreement commencing with the first anniversary of the Amendment Date: | Annual Fee payable by Customer to AVS, as converted into U.S. dollars, if applicable, using the rate published in the Wall Street Journal at each anniversary of the Amendment Date for internal application development using AVS Software by any number of Customer's employees for the Customer Applications authorized herein and distribution of said Customer Applications to any number of End Users: |
|---|---|
| $1,000,001 to $3,000,000 | $60,000 |
| $3,000,0001 to $10,000,000 | $70,000 |
| $10,000,001 to $20,000,000 | $90,000 |
| $20,000,001 to $50,000,000 | $130,000 |
| $50,000,000+ | Custom quotation provided by AVS as required |

   5.3. <u>Calculation of Net Revenue in the case of integrated software and services offerings</u>. In the event that Customer does not charge End Users for Customer Applications or Customer Applications are bundled with solutions or services and have no retail or ascertainable value, Net Revenue shall be defined as follows: Gross revenues of Customer less credits, returns, shipping charges, sales taxes, and custom duties, as converted into U.S. dollars, if applicable, using the rate published in the Wall Street Journal at the anniversary of each Amendment Date, derived from Customer solutions or services containing Customer Applications creat-

2

CONFIDENTIAL

ed with or containing AVS Software sold during each 12 months during the Term of this Agreement, commencing with the first anniversary of the Amendment Date.

5.4.  Calculation of Annual Fees in the event of cessation of development of Customer Applications. After the expiration of the first year anniversary of this Amendment (or, in the case of Customers payment to AVS of $70,000 pursuant to Section 5.1 of this Amendment, after the expiration of the second anniversary of this Amendment), if Customer, for any reason ceases use of the AVS Software (which shall be deemed first used as of the Amendment Date) and provides Notice to AVS at least 60 days prior to any anniversary of the Amendment Date, Customer shall retain the right to sublicense and distribute AVS Software solely as integrated into the then-extant versions of Customer Applications for the life of then-extant sublicenses for advance payment of 65% of the Annual Fee as would be payable using the Fee Schedule for each year of the Agreement that is subject to this provision, provided that payment is made on or before the expiration of any anniversary of the Agreement. IT IS EXPRESSLY UNDERSTOOD THAT THE PROVISIONS OF THIS PARAGRAPH PROHIBIT CUSTOMER FROM MAKING ANY ENHANCEMENTS OR IMPROVEMENTS TO CUSTOMER APPLICATIONS AND THAT USAGE OF THE AVS SOFTWARE IS LIMITED EXCLUSIVELY TO THE ESSENTIAL MAINTENANCE OF CUSTOMER APPLICATIONS BY APPLICATION DEVELOPERS.

5.4.1.  If the cessation option of this Section is exercised by Customer and Customer at a later date wishes to restore any unrestricted right to use the AVS Software, all amounts not paid to AVS as a result of this provision must be paid in full before Customer commences unrestricted use of the AVS Software.

5.4.2.  Should the provisions of this Section 5.4 become effective, the Agreement shall be in full force and effect and deemed not terminated until such time as Customer shall provide Notice of termination, in which case the applicable provisions of Section 5.4 shall prevail.

5.4.3.  If Customer pays AVS $70,000 pursuant to Section 5.1 of this Amendment and wishes at anytime during the first 2 consecutive years to restore any unrestricted right to use the AVS Software imposed by Section 5.1, Customer shall provide notice to AVS with remittance of an amount equal to the pro rata share of the applicable Annual Fee that Customer would have paid for such unrestricted right under the Fee Schedule.  By way of example and for illustrative purposes only, if 10 months after the Amendment Date Customer wishes to add new features to any Customer Application using the AVS Software, Customer must remit $29,166 to AVS ($120,000 cost of 2 years of Annual Fees at $60,000 per year) less ($70,000 paid to AVS as of the Amendment Date) equals $50,000 (divided by 24 months in the 2 year initial term) equals ($2,083 for each month of initial 2 year term) multiplied by (14 months remaining in the initial 2 year term).

5.5.  Right to audit. To ensure compliance with the terms of this Agreement, AVS shall have the right, not more than once per year and upon 30 days Notice, to have an inspection and audit of all the books and records of Customer, conducted by an independent certified public accountant reasonably acceptable to both parties, whose fee is paid by AVS.  Such audit shall be conducted during regular business hours at Customer's offices and in such a manner as not to interfere with Customer's normal business activities.  Customer will promptly pay AVS any amounts determined to have been underpaid plus reasonable and actual costs incurred in the enforcement of this Section 5.5.

3

CONFIDENTIAL

    5.6.    <u>Support Fee amount and payment terms</u>. The support fee ("**Support Fee**") for Support of the AVS Software as defined in Addendum B to this Agreement shall be included in each Annual Fee payment.

6.  <u>Notices.</u> The Notices section of Addendum A is replaced in its entirety as follows:

    To AVS: 300 Fifth Ave., Waltham, MA 02451, Attn: CEO

    To Freeslate: 415 Oakmead Parkway, Sunnyvale, CA 94085, Attn: CFO

    To: Accelrys: 5005 Wateridge Vista Drive, San Diego, CA 92130, Attn: CFO

7.  <u>Services</u>. The following section is added to Addendum A:

7.1. <u>CUSTOMER SERVICES.</u>

    a.  For each year that this Agreement is in effect and Customer pays the full applicable Annual Fee, Customer shall be entitled to the applicable number of hours of AVS services ("**Customer Service Allowance**") from the following table:

| **Minimum Annual Fee paid by Customer to AVS** | **Number of hours included in Customer Service Allowance in each applicable year of the Agreement** | |
|---|---|---|
| $50,000 | 24 | |
| $70,000 | 48 | |
| $90,000 | 72 | |
| $130,000 | 80 | |

    b.  The Customer Service Allowance may be applied to any of the following AVS services. To the extent that Customer exceeds the hours in the Customer Service Allowance, the rates specified under the Professional Services subsection that follows shall be applicable:

        i.  <u>Training.</u>

            1.  <u>Location of training</u>. Training can be conducted at any site designated by Customer, provided that all facility costs related to training are paid for by Customer.

            2.  <u>Training process</u>. A prescribed training syllabus is followed for a 3 day standard OpenViz training course.

4

CONFIDENTIAL

3. <u>Delivery of training</u>. AVS will provide the training in accordance with generally accepted industry standards. If an AVS employee or subcontractor providing training under this Addendum is unable to complete the task (for example, due to sickness or resignation), AVS will use commercially reasonable efforts to provide another employee or subcontractor of similar experience to fulfill the contract.

4. <u>Training expenses</u>. Customer shall reimburse AVS for all reasonable travel, accommodation, subsistence and other expenses incurred by AVS in connection with the performance of training services if approved by Customer in advance and provided AVS submits proper receipts in support of any expense(s) incurred.

ii. <u>Advisory Services</u>.

1. <u>Advisory practice</u>. AVS will provide advice and instructions on the use, implementation and architecture of the AVS Software ("**Consultations**") but will not author or supply code using the AVS Software or any other technology for Customer unless it is delivered under a Statement of Work as defined below under Professional Services. Each Consultation request shall be so identified at the time of request and made exclusively by a Named Support Contact.

iii. <u>Professional Services</u>.

1. <u>Statements of Work</u>. As requested by Customer and subject to written acceptance by AVS, AVS will provide professional services ("**Professional Services**") described in exhibits, schedules, or statements of work (hereafter "**Statements of Work**"). Each Statement of Work shall include, at a minimum, a description of Professional Services to be performed, an estimate of time and materials charges, and any additional terms to which the parties agree.

2. <u>Conflicts between Statements of Work and this Agreement</u>. If a provision contained in a Statement of Work conflicts with a provision the Agreement or its Addenda, the provision in the Statement of Work shall prevail, provided that the Statement of Work was signed by an Authorized Representative of both Customer and AVS. In the absence of joint authorization by an Authorized Representative, this Agreement shall govern without exception in the event of a conflict between a Statement of Work and the Agreement.

3. <u>AVS conduct and performance</u>. AVS will provide Professional Services in accordance with generally accepted industry standards. It will have appropriate agreements with its employees and subcontractors to enable it to comply with its obligations under this agreement. If an AVS employee or subcontractor providing Professional Services under this Addendum is unable to complete the task (for example, due to sickness or resignation), AVS will use its best efforts to provide another employee or subcontractor of similar experience to fulfill the contract.

5

CONFIDENTIAL

4. Customer's obligations. Customer agrees to provide a suitable working environment for AVS' staff when they are required to work on the Customer's site. It also agrees that its personnel will respond in a timely manner to inquiries from AVS employees relative to Professional Services to be performed under any Statement of Work. Customer acknowledges and agrees that AVS' performance is dependent in part on Customer's actions. Accordingly, any dates or time periods relevant to performance of any Professional Services by AVS shall be equitably extended to account for any delays due to Customer.

5. Charges for Professional Services. Should Customer exceed the Customer Service Allowance, Customer shall pay AVS for Statements of Work (or other services) on a time and materials basis pursuant to the following fee schedule(s):

| Rates for PREPAID Statements of Work | |
| --- | --- |
| Number of 8 hour days of service prepaid by Customer prior to the commencement services | Corresponding daily rate for on-site or off-site services |
| 1-6 | $2,400.00 |
| 7-12 | $2,160.00 |
| 13-24 | $2,040.00 |
| 25-37 | $1,920.00 |
| 38-49 | $1,800.00 |
| 50+ | $1,560.00 |

6. Pre-purchased days may be applied towards any customer service provided by AVS.

7. Pre-purchased days must be used within one year of the date of invoice.

| Rates for NON-PREPAID Statements of Work | |
| --- | --- |
| Number of 8 hour days of service delivered | Corresponding daily rate for on-site or off-site services |
| Any | $2,400.00 |

8. Annual adjustment of Fees for Professional Services. Upon each anniversary of the Effective Date all fees for Professional Services shall increase by 5% per annum.

9. Travel expenses. Customer shall reimburse AVS for all pre-approved and reasonable travel, accommodation and sustenance expenses incurred by AVS in connection with the performance of Professional Services, subject to the presentation of receipts for such expenses.

10. Payment terms for Professional Services. AVS will invoice Customer for Professional Services and related out-of pocket expenses on a regu-

6

CONFIDENTIAL

lar basis as specified in the Statement of Work, and Customer shall pay such invoiced amounts as agreed herein. If Customer fails to make payments when due, AVS, in addition to its other rights and remedies, will have the right to terminate Professional Services immediately. If Customer enters into a Statement of Work with provisions for prepayment of Professional Service charges, work will not commence until payment has been received.

11. Ownership of Statement of Work product. All newly-created software and intellectual property arising out of any Professional Services provided under this Addendum that incorporates Confidential Information of Customer or intellectual property of Customer that is protected by trade secret or patent ("**Customer IP**") including without limitation that in any programs, operating manuals, techniques, specifications and documentation shall become the exclusive property of Customer.

12. Uninterrupted use of Statement of Work product. AVS grants Customer perpetual, irrevocable and non-exclusive permission to use any newly created software and intellectual property (other than the AVS Software) that is not Customer IP, subject to the terms of this Agreement.

13. Use of techniques and procedures involved in delivery of Statement of Work product. AVS shall be permitted the use (without cost, required permission or any other restriction) of any visualization, programming, data access, data management, data manipulation or other technique that may be discovered or developed in connection with this Agreement, provided and to the extent that such techniques do not infringe upon Customer IP and do not make use of Confidential Information of Customer.

14. Ownership of AVS Software. During the term of this Agreement or following its termination, under no circumstances shall Customer be granted any right, title or interest in the AVS Software in its object or source code form. AVS retains exclusive ownership of all copyrights, patents, trade secrets and other proprietary rights in and to any of its software products, including, without limitation, the techniques, code, algorithms and processes contained therein.

c. Limitations on customer service allowances.

i. Expiration of Customer Service Hours. The annual Customer Service Allowance must be used within each applicable 12 month period. Unused Customer Service Allowance hours shall expire at each anniversary of the Amendment Date. In the event that Customer exercises the Multiyear Prepayment option, the total Customer Service Allowance for the full period of Multiyear Prepayment may be utilized at any time during the applicable Multiyear Prepayment period and unused hours shall expire only at the end of the applicable Multiyear Prepayment period.

ii. Provision for non-payment of Annual Fees. Utilization of the Customer Service Allowance may be specified by Customer at the commencement of each anniversary year of the Agreement. If, however, Customer fails to make any sched-

7

uled installments of the Annual Fee as required under the Agreement and causes a breach of the Agreement, AVS shall be entitled to immediately invoice Customer (at the rate specified under Professional Services) for the pro rata share of Customer Service Allowance hours for which no payment was made and service was provided, and Customer shall immediately pay AVS for such hours.

iii.   Provision for cessation of development using the AVS Software. In the event that Customer exercises its rights under Section 5.4 of Addendum A, the Customer Service Allowance shall be reduced to 8 hours per year.

iv.   Work limited to projects associated with the AVS Software. Customer Service Hours will be delivered by AVS exclusively for assignments that are directly related to the development of Customer Application(s) authorized hereunder. In the event of a Change of Control by Customer, AVS shall be under no obligation to provide Professional Services related to an assignment that transfers functionality of the AVS Software to software or processes other than a Customer Application authorized hereunder.

v.   Work for Hire. It is expressly understood that any Professional Services or Customer Service Allowance hours delivered by AVS under this Agreement shall not be construed as "work for hire".

Except as expressly set forth herein or otherwise required to accord with the intent hereof, the remaining provisions of the Agreement shall be unchanged and shall remain in full force and effect from and after the date hereof.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed by their duly authorized representatives.

ADVANCED VISUAL SYSTEMS INC.

By: _____

Print Name: _____Steve Sukman_____

Title: _____CEO_____

Date: _____27 Jun 2013_____

ACCELRYS, INC.

By: _____

Print Name: _____MICHAEL A -PIRRINO_____

Title: _____EVP REFO_____

Date: _____6/27/2017_____

FREESLATE, INC.

By: _____

Print Name: _____RICHARD ROSENTHAL_____

Title: _____CFO_____

Date: _____6/27/2013_____

8

EXHIBIT C



April 13, 2016

Advanced Visual Systems Inc.
75 Remittance Drive, Box 6529
Chicago, IL 60675-6529

Attention: Steve Sukman

This letter is to notify Advanced Visual Systems, Inc. (AVS) per the terms of Amendment No.2 to Master Licensing Development & Distribution Agreement between AVS, Accelrys Inc., and Freeslate Inc. dated June 27, 2013, we have ceased use of AVS Software in development of customer applications.

Sincerely,

Jason Novi
CFO

415 Oakmead Parkway , Sunnyvale,  CA 94085          408.773.4000 phone
www.freeslate.com                                  408.773.4002 fax

# EXHIBIT D

 AVS                                    Q         Virtual service agent

Home / AVS Support Help Center / SUPPORT-962

# OpenViz dependency on .Net 1.1

 **Shashi Kamath** raised this on 2025-Jun-04 1:31 PM          **Hide details**

### Description

We are in the process of upgrading a legacy application which is using AVS\OpenViz version 2.6 . But this version of openviz is dependent on the .net framework 1.1. We would like to upgrade the .net version to 4.8.1. We would like to know if there is a version of openviz which is compatible with .net framework 4.8 ? At present the application crashes [ c++ projects are compiled in vs 2010 with /clr option on in c++ project].

**Priority**

High

**OpenViz Editions**

Particles

**OpenViz Codebase**

.NET

**OpenViz Versions**

2.6

**Operating System(s)**

Windows 64-bit

**Company Name**

Unchained Labs

**Company Address**

4747 Willow Road Pleasanton CA, USA

**AVS Invoice/Order/Customer Number**

We acquired a company that used this control

## Activity

 **Shashi Kamath**  2025-Jun-04 1:31 PM



**openviz.png**
04 Jun 2025, 01:30 PM

 **Automation for Jira**  2025-Jun-04 1:31 PM

Thanks for contacting us! We just wanted to let you know that your message was received and a member of our support team will be responding to you as soon as possible.

If you have any additional comments or questions you'd like to add while you wait to hear back, please feel free to update your support ticket.

Thanks,
AVS Support

 **AVS Support**  2025-Jun-05 10:29 AM

Hi,

In order to provide support, we first need to validate your original license/support contract.

Please provide us with the details of the previous company and a way to verify transfer of license via acquisition.

Thanks,

AVS Support

 **Shashi Kamath**  2025-Jun-05 12:52 PM

Please see the attached file for the licensing information. I have ccd Serena also here, who is the original license holder from Free slate. She is part of Unchained Labs now.

**Shashi Kamath**

Sr.Dir Software Eng.

925.482.4240

unchainedlabs.com

# EXHIBIT E



**OpenVizLicenseKeys.txt**
05 Jun 2025, 12:52 PM

*(0.8 kB)*

 **AVS Support**  2025-Jun-05 3:43 PM

Hi Shashi,

Can you please detail any development or deployment of the application embedding OpenViz since 2016?

Also, when you say you are upgrading the application, what does this mean?

Thanks,

AVS Support

 **Shashi Kamath**  2025-Jun-05 4:10 PM

This is a much older application called PolyView. We have not done any changes to this app in the last 10+ years.

It does get deployed as a part of a software package called LEA, one of our lab automation products. We use openviz to show some 2D / 3D data in that application.

We have a customer pressing us to get rid of older .net ( anything below 4.8) dependency for security concerns.

We are committed to doing that now. So, we need a version of OpenViz that uses later version of .net.

**Shashi Kamath**

Sr.Dir Software Eng.

925.482.4240

unchainedlabs.com

 **AVS Support**  2025-Jun-05 4:43 PM

Hi Shashi,

Unfortunately, I do not have good news.

Freeslate terminated Development, Support, and Deployment rights on April 13. 2016. This means that you cannot further any efforts beyond the last build from 2016.

# EXHIBIT F

- **AVS Invoice/Order/Customer Number**

We acquired a company that used this control

## Activity

 **Shashi Kamath**  2025-Jun-04 1:31 PM



openviz.png
04 Jun 2025, 01:30 PM

 **Automation for Jira**  2025-Jun-04 1:31 PM

Thanks for contacting us! We just wanted to let you know that your message was received and a member of our support team will be responding to you as soon as possible.

If you have any additional comments or questions you'd like to add while you wait to hear back, please feel free to update your support ticket.

Thanks,
AVS Support

 **AVS Support**  2025-Jun-05 10:29 AM

Hi,

In order to provide support, we first need to validate your original license/support contract.

Please provide us with the details of the previous company and a way to verify transfer of license via acquisition.

Thanks,

AVS Support

 **Shashi Kamath**  2025-Jun-05 12:52 PM

Please see the attached file for the licensing information. I have ccd Serena also here, who is the original license holder from Free slate. She is part of Unchained Labs now.

**Shashi Kamath**

Sr.Dir Software Eng.

925.482.4240

unchainedlabs.com

# EXHIBIT G



**OpenVizLicenseKeys.txt**
05 Jun 2025, 12:52 PM

(0.8 kB)



**AVS Support**  2025-Jun-05 3:43 PM

Hi Shashi,

Can you please detail any development or deployment of the application embedding OpenViz since 2016?

Also, when you say you are upgrading the application, what does this mean?

Thanks,

AVS Support



**Shashi Kamath**  2025-Jun-05 4:10 PM

This is a much older application called PolyView. We have not done any changes to this app in the last 10+ years.

It does get deployed as a part of a software package called LEA, one of our lab automation products. We use openviz to show some 2D / 3D data in that application.

We have a customer pressing us to get rid of older .net ( anything below 4.8) dependency for security concerns.

We are committed to doing that now. So, we need a version of OpenViz that uses later version of .net.

**Shashi Kamath**

Sr.Dir Software Eng.

925.482.4240

unchainedlabs.com



**AVS Support**  2025-Jun-05 4:43 PM

Hi Shashi,

Unfortunately, I do not have good news.

Freeslate terminated Development, Support, and Deployment rights on April 13. 2016. This means that you cannot further any efforts beyond the last build from 2016.

Freeslate and AVS have not agreed that any previous agreement has been transferred to you at Unchained Labs (this would require a contract Amendment with legal).

Unchained Labs does not have any agreement with AVS.

Just to be clear, **you do not have any rights to use OpenViz in any way.**

If you have any further questions or inquiry, please let me know and I would be happy to connect you.

Thank you,

AVS Support

 **Shashi Kamath**  2025-Jun-05 4:51 PM

Can we buy a newer version of openviz ?

If yes, does it work with .net 4.8 without older versions?

What's the cost of the control ?

> Signature

 **AVS Support**  2025-Jun-05 5:04 PM

Hi Shashi,

I'd be happy to put you in touch with someone who could help you further in regard to licensing and support of OpenViz. (It is based on derived revenue in which the product is embedded, so please have that number ready for your discussion.)

Please provide your email, contact number, and a best time to be reached (please include your time zone).

To answer your technical question, it appears you are using v2.6. I believe that we do have later versions in v2 that would work with .NET 4.8 (still COM with .NET interops). We also have v4 which is a pure .NET version and would require you to update your codebase.

We would need to get more information about your development environment, language being used, if you are intending to move to the latest version of OpenViz, etc. and your deployment plan.

OpenViz is an API that is being used in your control, so not sure about your build environment outside of our API.

Thanks,

AVS Support

# EXHIBIT H

# BRODIGAN AND GARDINER LLP
### ATTORNEYS AT LAW
### 40 BROAD STREET
### BOSTON, MASSACHUSETTS 02109

JOSEPH J. BRODIGAN, P.C.
WILLIAM D. GARDINER
MICHAEL B. BRODIGAN
JOSEPH J. BRODIGAN, JR.
BRIAN J. BRODIGAN

(617) 542-1871

jbrodigan@brodiganlaw.com
wgardiner@brodiganlaw.com
mbrodigan@brodiganlaw.com
jbrodiganjr@brodiganlaw.com
bbrodigan@brodiganlaw.com
FACSIMILE: (617) 482-1871

November 20, 2025

Al Browne, Esquire
Cooley LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736

Unchained Labs
1380 Soldiers Field Road, Suite 2200
Brighton, MA 02135

Re:    M.G.L. c. 93A claim letter

Dear Attorney Browne:

Please be advised that this office represents Advanced Visual Systems, Inc. ("AVS"). This is a claim letter pursuant to M.G.L. Chapter 93A. This letter is sent to you as you have indicated that you are the attorney for Unchained Labs. This letter seeks damages due to the unfair and deceptive business practices of Unchained Labs. These practices have occurred in the Commonwealth of Massachusetts and various other locations.

These claims arise from the intentional, secret, and deceptive unauthorized use of my client's software by Unchained Labs.

AVS is the sole owner of the proprietary rights to use the software known as "OpenViz". OpenViz is a data visualization software that AVS sublicenses out to different customers on a non-exclusive basis. Pursuant to the strict terms of AVS's Master Licensing, Development & Distribution Agreements, Authorized AVS customers have the right to use this software. No use of that software is allowed without the prior authorization of AVS.

On or about July 9, 2003, AVS entered into a Master Licensing, Development & Distribution Agreement to sublicense OpenViz to a company called Symyx Technologies, Inc. ("Symyx"). A copy of this agreement is attached hereto as Exhibit A. Pursuant to this agreement, Symyx agreed to pay AVS an annual fee that provided for increases tied to revenue generated from Symyx applications containing the AVS software.

BRODIGAN AND GARDINER LLP

On or about July 1, 2010, Symyx became known as Accelrys, Inc. ("Accelrys") through a sale of all of Symyx's assets to Accelrys. As part of this transaction, AVS agreed to an assignment of the Symyx Master Licensing, Development & Distribution Agreement to Accelrys. This assignment was completed by an amendment to the Master Licensing, Development & Distribution Agreement.

On or about June 27, 2013, with the consent of AVS, Accelrys assigned its rights under the Symyx Master Licensing, Development & Distribution Agreement to a company called Freeslate, Inc. ("Freeslate"). This assignment was completed by an amendment to the Master Licensing, Development & Distribution Agreement. A copy of this amendment is attached hereto as Exhibit B.

Pursuant to the June 29, 2103 amendment, Freeslate agreed to pay AVS an annual fee that provided for increases tied to revenue generated from Freeslate's applications created with or containing the AVS software.

On April 13, 2015, AVS received notification from Freeslate that it had ceased the use of the AVS software in the development of customer applications. Importantly, this notification only pertained to development rights and did not cover deployment or distribution. AVS reasonably relied upon this representation, and subsequently stopped receiving fees from this sublicense.

On June 4, 2025, AVS received a support inquiry from Shashi Kamath, the Senior Director of Software Engineering for Unchained Labs. A copy of this conversation is attached hereto as Exhibit C. This email indicated that Unchained Labs was updating a legacy application which was using the AVS/OpenViz software version 2.6, and that they needed an update to that software to support a customer. This was the same software that AVS sublicensed to Freeslate.

Subsequently, AVS learned that in February, 2016, that the assets of Freeslate were sold to Unchained Labs, and this sale apparently included applications that were created with or containing the AVS software.

On June 5, 2025, Mr. Kamath was asked to detail any development or deployment of the application embedding the AVS software since 2016. Mr. Kamath indicated that this software was embedded in an application called PolyView and that the software did get deployed as part of a software package called LEA. He also

BRODIGAN AND GARDINER LLP

admitted that OpenViz was used to show 2D/3D data in that application and that they had customers that were using this application. He also emailed a file that contained the licensing information that he was relying upon for Unchained Labs use of the software. This information pertained to the Freeslate sublicense agreement. These emails were also copied to a former Freeslate employee that was now part of Unchained Labs. This employee was described as the original license holder of the AVS software from Freeslate. Thus, there is no dispute that Unchained Labs knew that AVS owned the proprietary rights to use OpenViz. Copies of these emails are attached as Exhibit D.

These emails came as complete surprise to AVS. AVS did not have any relationship with Unchained Labs and it had not sublicensed or authorized that company to use that software. AVS responded to these emails by indicating that Freeslate had terminated its use of the software, and Unchained Labs had no agreement or right to use that software. A copy of this email is attached as Exhibit E.

After the above emails, there were discussions about Unchained Labs purchasing a "newer version of OpenViz." These discussions were both by email and telephone. Anoop Chatterjee, the CTO of AVS, spoke to Mr. Kamath on the telephone. During that call, when Mr. Kamath was asked why Unchained Labs had not paid AVS for its use of the software. He shockingly indicated that Unchained Labs routinely acquires software and uses it without verifying if it has the authority to do so. He indicated that Unchained Labs uses that software, and when there is an issue, it contacts the company for support. He stated in many cases, the company no longer exists and they continue on using the software. From this conversation, it was clear that Unchained Labs intentionally uses proprietary software without paying for it with the hope that it would not get caught.

AVS responded to the above communications by requesting that Unchained Labs compensate it for its longstanding unauthorized use of the AVS software. Unchained Labs responded by indicating that it no longer needed support, but ignored any response about continued use of the software.

Given the above, it is beyond any dispute that Unchained Labs intentionally, secretly, and deceptively used my client's software without authorization. It is also clear that Unchained Labs has been engaged in these actions since 2016.

## BRODIGAN AND GARDINER LLP

The measure of damages to my client is also not limited to the fees set forth in the Freeslate agreement. Unchained Labs has used this software without an agreement. Accordingly, the damages are the fair market value of the sublicense. The fair market value of that use is $960,000. This is based upon comparable market rates that my client has obtained for similar sublicenses during this time period. Attached hereto as Exhibit F is a breakdown of this value.

This course of conduct is a clear violation of MGL Chapter 93A. Violations of that statute provide for double or treble damages, plus attorney fees. If Unchained Labs fails to make a fair and reasonable settlement offer, AVS is prepared to exercise all legal rights available to protect its interests in this regard. This will include action to recover all damages, plus multiple damages and attorney fees, and whatever legal remedies that are available. Also in any legal proceeding we will seek a complete audit of all revenue generated from any applications using the AVS software from 2016 to the present. We will also seek any evidence that demonstrates that Unchained Labs has improperly used other software in the same way, that is not owned by AVS. This will be extremely relevant in proving that Unchained Labs intentionally engaged in an intentional course of conduct in this matter.

Demand is hereby made for a response to this letter within ten days of the date of this letter. Any response must include evidence that Unchained Labs is no longer using the AVS software and a reasonable settlement proposal. Failure to respond appropriately will result in further action.

Please guide yourself accordingly.

Very truly yours,

Joseph J. Brodigan, Jr.

JJBjr:mff

# EXHIBIT A



## MASTER LICENSING, DEVELOPMENT & DISTRIBUTION AGREEMENT

This Master Licensing, Development & Distribution Agreement (the "Agreement") is between Advanced Visual Systems Inc., a Delaware corporation ("AVS") and Symyx Technologies, Inc., a Delaware corporation, and its wholly-owned subsidiary Symyx Discovery Tools, Inc., a California corporation (collectively, "Customer"). The Agreement governs all transactions between AVS and Customer. The following Addendums, when signed by Customer and AVS are incorporated in this Agreement by reference and shall be governed by the terms of this Agreement:

Addendum A:      AVS Software and Fee Schedule
Addendum B:      Customer Support

PURPOSE OF AGREEMENT. AVS has developed, distributes, and will continue to develop and distribute AVS Software as described below. Upon payment of applicable fees and subject to the terms of this Agreement and the applicable addenda, a Customer will be entitled to use the object code form of AVS Software during the Term of this Agreement, and to develop and distribute its own applications using AVS Software, and to receive support for the AVS Software.

2.     DEFINITIONS.

2.1     "AVS Software" means the commercially available computer software in object code form provided by AVS and described in Addendum A, including all associated documentation, as well as any updates or upgrades (including without limitation Internal Improvements, as defined in Section 7.1(c)) provided under Addendum B.

2.2     "Customer Seat Application" means a software product developed, marketed, and supported by Customer consisting of an integrated combination of (i) certain components of the AVS Software and (ii) software developed and supported by Customer as described in Addendum A. Customer must have added substantial value to the AVS Software when creating the Customer Seat Application, such that the portion of the value of the Customer Seat Application consisting of AVS Software is less than 50% of the total value of the Customer Seat Application. Customer Seat Application must be a product targeted for a vertical market and cannot be sold or marketed as a general purpose visualization or development product. Customer Seat Application includes all documentation relating specifically to the Customer Seat Application.

2.3     "Customer Server Application" means a software application developed and supported by Customer consisting of an integrated combination of (i) certain components of the AVS Software and (ii) software developed and supported by Customer as described in Addendum A. Customer must have added substantial functionality to the AVS Software when creating the Customer Server Application, such that the portion of the functionality of the Customer

Server Application consisting of AVS Software is less than 50% of the total functionality of the Customer Server Application.

Customer Server Applications can be accessed and viewed by End Users only in read-only format, and distributed via file, Web or application server, and cannot be modified by the End User.

2.4    "End User" means a licensee of Customer Seat Application or a Customer Server Application who is authorized pursuant to the terms of this Agreement to use AVS Software.

2.5    "Subdistributor" means a distributor that is part of Customer's customary distribution channels, and that distributes Customer Seat Application.

3.    LICENSE.

3.1    Permitted Uses. AVS hereby grants to Customer a non-exclusive, non-transferable, worldwide license during the Term of this Agreement, subject to Customer's compliance with the terms and conditions of this Agreement and payment of the applicable fee(s) to:

    A.    Use such number of copies of AVS Software as are set forth on Addendum A.

    B.    Make one copy of the AVS Software for back-up purposes and such other copies as are expressly permitted herein.

    C.    Develop Customer Seat Applications or Customer Server Applications as set forth on Addendum A using the AVS Software.

    D.    Sublicense and distribute the AVS Software to the extent it is incorporated in the Customer Seat Application Software, as more fully described in Section 3.3 below.

    E.    Provide read-only access to the AVS Software to the extent it is incorporated in a Customer Seat Application or Customer Server Application.

3.2    Fees. Customer shall pay AVS the fees set forth on Addendum A with respect to the following license components:

    A.    Internal use of AVS Software for application development as permitted in Sections 3.1A and 3.1C of this Agreement.

    B.    Distribution and deployment of each copy of Customer Seat Application licensed pursuant to Section 3.1 D of this Agreement and/or each Customer Server Application made available to End Users

2

pursuant to Section 3.1 E of this Agreement.

C.    Maintenance and support of AVS Software pursuant to the terms of Addendum B of this Agreement.

3.3    Sublicense/Distribution and Deployment Rights. Customer's rights to sublicense and distribute to End Users the AVS Software contained in Customer Seat Applications or to deploy Customer Server Applications shall be subject to the following restrictions:

A.    Customer may distribute Customer Seat Applications solely to End Users and/or to Subdistributors.

B.    Customer shall have no right to (i) distribute AVS Software directly or indirectly, except as integrated into Customer Seat Applications in object code form, or (ii) otherwise to deploy AVS Software directly or indirectly, except as integrated into a Customer Server Application in read-only format, in each case pursuant to the terms of this Agreement. Customer shall not knowingly distribute or otherwise make available Customer Seat Applications or Customer Server Applications to End Users who intend to use the AVS Software contained in the Customer Seat Applications or Customer Server Applications to run applications other than those provided in such Customer Seat Applications or Customer Server Applications.

C.    Customer shall safeguard AVS's proprietary rights in the AVS Software and all copies of the AVS Software incorporated in Customer Seat Applications and Customer Server Applications with at least the same protections as it provides for its own proprietary information, including, without limitation, by causing each Subdistributor and End User to sign a sublicense agreement prior to receipt of Customer Seat Applications or by distributing the Customer Seat Application with an enforceable shrink-wrap, click-wrap or similar license, containing, at a minimum, the following prohibitions:

1)    No copying (except for back-up purposes).
2)    No disassembling, decompiling or reverse engineering.
3)    No removal of AVS copyright notices.

D.    Customer may directly or through a fulfillment provider make copies of the AVS Software solely to the extent necessary to create copies of Customer Seat Applications or Customer Server Applications to sublicense to End Users and Subdistributors as permitted herein.

E.    Customer agrees that Customer Seat Applications and Customer Server Applications shall not, under any circumstances, include the file "developer.jar" for JAVA applications.

3

F.    If Customer ceases to pay use/development fees under this Agreement, but continues to pay distribution/deployment fees according to the provisions of Addendum A to this agreement or AVS' then-prevailing fee schedule, Customer shall retain the right

to (i) sublicense and distribute the AVS Software solely as integrated into the then-extant versions of Customer Seat Applications, or (ii) provide network access to then-extant versions of the Customer Server Applications, as the case may be. However, Customer shall have no further right to use the AVS Software to develop new Customer Seat Applications or Customer Server Applications and no right to sublicense or distribute the AVS Software as part of any new Customer Seat Application or Customer Server Application.

G.    Notwithstanding anything in this Agreement to the contrary, Symyx shall be allowed to distribute the Symyx Renaissance® Software Developer's Kit, incorporating AVS OpenViz (as defined in this Agreement), to End Users.

3.4    <u>Limitations on use.</u> This Agreement does not grant to Customer any right to copy AVS Software except as expressly provided herein. Customer may not reverse engineer, reverse compile, or otherwise attempt to recreate the source code version of the AVS Software. Customer may not sublicense, distribute or deploy AVS Software except as expressly provided in Sections 3.1 D, 3.IE and 3.3. The AVS Software constitutes "restricted rights" software for purposes of government contracting and subcontracting.

3.5    <u>Delivery.</u> AVS will use its best efforts to ship within thirty (30) days of its acceptance of Customer's order. Customer shall pay all costs of shipping. Delivery will be FOB AVS's plant or manufacturing source, at AVS's option. In the absence of prior shipping instructions, AVS will select the carrier on behalf of Customer, but shall not assume any liability for shipment or choice of carrier, nor shall the carrier be construed to be an agent of AVS. AVS may, in its sole discretion, provide Customer with the option to download the AVS Software.

4.    <u>PAYMENT.</u> Unless otherwise provided in Addendum A, Customer shall pay all amounts due under this Agreement in United States dollars to the address specified on each AVS invoice, within thirty (30) days from the date of invoice. AVS may charge interest on overdue amounts at the rate of 1.5% per month or the highest lawful rate, whichever is less. Customer shall be responsible for all taxes incurred with respect to AVS deliverables, except those taxes based on AVS's income or payroll.

5.    <u>TERMS AND TERMINATION.</u>

4

5.1     Term of Agreement. This Agreement shall commence on the date identified on Addendum A of this Agreement ("Effective Date") and shall continue for the term indicated upon Addendum A.

5.2     Termination for Breach. If any material breach of this Agreement (including, without limitation, Customer's nonpayment of fees due hereunder) by either party continues after thirty days' written notice of the breach to the other party, the party giving notice may terminate this Agreement immediately. Notwithstanding the foregoing, AVS shall have the right to terminate this Agreement immediately if Customer is in breach of the provisions of Sections 3.3, 3.4 or 9 hereof.

5.3     Termination for Bankruptcy. This Agreement shall terminate if Customer files a petition for bankruptcy or has an involuntary petition filed on its behalf, and the petition is not terminated or dismissed within sixty (60) days. AVS may also terminate this Agreement upon Customer's dissolution, liquidation, assignment for the benefit of creditors, or the appointment of a receiver, trustee, custodian, or similar agent for Customer's business or property.

5.4     *Intentionally Omitted.*

5.5     Obligations on Termination. Upon termination of this Agreement for any of the foregoing reasons:

      A.     Each party shall continue to be responsible for safeguarding the other's proprietary and/or confidential information in accordance with the terms of this Agreement (subject to the provisions of clause (E) below).

      B.     Each party shall erase, destroy or delete, or return to the other any of the other party's proprietary and/or confidential information in its possession. If requested, the other party shall verify in writing to the requesting party within thirty (30) days that the requesting party's proprietary and/or confidential information has been returned, destroyed, deleted or erased.

      C.     If Customer has developed Customer Seat Applications or Customer Server Applications as described in Section 3.1, Customer may continue to sublicense and distribute, or deploy (as applicable), the AVS Software contained therein so long as Customer continues to pay the Fees described in Section 3.2 (subject to any Consumer Price Index increase adjustments under the Fee Schedule included in Addendum A, as applicable). Otherwise, Customer shall immediately discontinue all use, sublicense, distribution and deployment (if applicable) of the AVS Software in its possession (including any copies placed in any storage device under Customer's control) and shall return or destroy all copies in its control subject to the provisions of subsection 5.5E of this Agreement.

5

D.  Upon termination of this Agreement, if Customer has distributed Customer Seat Applications or Customer Server Applications pursuant to Sections 3.1 and 3.3 of this Agreement, End Users shall be permitted the continued and uninterrupted use of the Customer Seat Application for the balance of the term of the applicable sublicense agreements, provided that all amounts owed to AVS under the terms of this Agreement are fully paid.

E.  Customer and each Subdistributor (if applicable) shall have the right to retain one copy of the AVS Software with respect to which

Customer has any sublicense agreement currently outstanding and may use such AVS Software solely to the extent required for support and maintenance under outstanding sublicense agreements in effect at termination. Customer and Subdistributors shall have no other right to use such copies of the AVS Software, or to sublicense or otherwise distribute products incorporating the AVS Software, or have any other rights with respect to the AVS Software.

F.  Customer shall cease all development of Customer Seat Applications and/or Customer Server Applications, and any revisions, enhancements or updates thereof that are based on AVS Software.

5.6  Survival. The provisions of this Agreement related to payment and confidentiality, and the other provisions of this Agreement, which by their nature are so intended, shall survive any termination of this Agreement.

6.  **LIMITATION OF LIABILITY.**

6.1  IN NO EVENT WILL EITHER PARTY BE RESPONSIBLE FOR ANY INCIDENTAL, SPECIAL, CONSEQUENTIAL, OR OTHER INDIRECT DAMAGES OR FOR ANY DAMAGES RESULTING FROM INACCURATE OR LOST DATA OR LOSS OF USE OR LOST PROFITS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, THE USE OR PERFORMANCE OF THE AVS SOFTWARE, OR ANY SERVICES PERFORMED BY AVS, WHETHER IN AN ACTION IN CONTRACT, TORT, OR IN ANY OTHER CAUSE OF ACTION OR ANY CLAIM FOR INFRINGEMENT. IN NO EVENT WILL AVS' TOTAL LIABILITY FOR ANY DAMAGES IN ANY ACTION BASED ON OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT (EXCEPT FOR A MATERIAL BREACH OF ARTICLE 9, FOR WHICH NO LIMITATION OF LIABILITY SHALL EXIST) EXCEED THE TOTAL AMOUNT PAID TO AVS BY CUSTOMER DURING THE PRECEDING 12-MONTH PERIOD FOR THE PRODUCT OR SERVICE FORMING THE BASIS FOR THE ACTION.

6

7.    **WARRANTIES AND LIMITATIONS.**

7.1    <u>Warranties</u>. AVS warrants to Customer that the AVS Software, as delivered by AVS to Customer and properly installed and operated on the computer system on which the AVS Software was intended to operate, will perform substantially as described in available documentation for sixty (60) days from the date of delivery (the "Warranty Period"). During the Warranty Period, if the AVS Software fails to so perform, Customer shall promptly notify AVS of, and adequately describe and re-create the failure, and Customer's exclusive remedy and AVS' sole obligation shall be to take the following actions:

A.    AVS will provide telephone or e-mail assistance to the Customer to resolve the problem during the non-AVS holiday period of Monday through Friday, 9:00 a.m. - 5:30 p.m. in the time zone

indicated upon Addendum B, and will make reasonable efforts to provide work-arounds and/or corrections for the reported problems in the affected copy of AVS Software; or,

B.    If such problem resolution is not successful, terminate the license and refund all license fees paid for the applicable copy of AVS Software.

C.    In addition, during the Warranty Period and while Customer is current in any support fees due hereunder, AVS will supply bug fixes ("Internal Improvements") to Customer as they become generally available. Only one set of Internal Improvements will be provided per customer unless otherwise specified in Addendum B.

7.2    <u>Limitations</u>. Because the AVS Software is complex, AVS does not warrant that the AVS Software is error-free or that its use will be uninterrupted. AVS shall not be obligated to remedy any AVS Software defect that cannot be adequately repeated. The warranties set forth in Section 7.1 do not apply to any AVS Software which (i) has been altered, except by AVS or in accordance with AVS-produced documentation, (ii) has been used in conjunction with another vendor's product, resulting in the defect, (iii) is other than the most current version of the AVS Software (to the extent that any failure of the AVS Software would have been avoided by the use of the most current version) or (iv) has been damaged by improper environment, abuse, misuse, accident or negligence. The warranties set forth in Section 7.1 do not apply to, and AVS specifically disclaims all warranties concerning, AVS Software identified as alpha or beta test versions, or as unsupported or discontinued versions; such AVS Software is furnished on as "as-is" basis only.

A.    SUBJECT TO THE PROVISIONS OF PARAGRAPH 6, THE FOREGOING WARRANTIES ARE EXCLUSIVE REMEDIES AND

7

ARE IN LIEU OF ALL OTHER REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE, INCLUDING WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

B.   No statement, including without limitation, representations regarding capacity, suitability for use, or performance of AVS Software, whether made by AVS's employees or otherwise, shall be deemed to be a warranty by AVS for any purpose or to give rise to any liability of AVS unless contained in this Agreement. AVS's warranty in Section 7.1 is for the benefit of Customer only. Customer may not grant, assign or otherwise transfer AVS's warranty to any other person or entity. AVS MAKES NO OTHER WARRANTY OF ANY KIND TO CUSTOMER OR TO ANY OTHER PARTY.

8.   CLAIMS OF INFRINGEMENT.

8.1   Indemnification by AVS

A.   Indemnification. AVS shall indemnify and hold Customer harmless from and against, and shall defend, any claim, suit or proceeding (an "action"), and pay any settlement amounts or damages awarded by a court of competent jurisdiction, arising out of claims by third parties that the AVS Software or any other AVS deliverable provided under this Agreement ("Deliverable") infringes any United States copyright, patent, trademark or trade secret, provided that Customer (i) notifies AVS promptly in writing of the action, (ii) provides AVS with reasonable information, cooperation and assistance in the defense or settlement of the action (at AVS' expense), and (iii) grants AVS sole authority and control of the defense or settlement of the action, subject to Customer's written consent of any proposed settlement, which shall be required solely if the terms of settlement are not confidential between the parties, and shall not be unreasonably withheld or delayed. Customer shall have no authority to settle any action on behalf of AVS, and no costs or expenses shall be incurred for the account of AVS without its prior written consent.

B.   Limitation of AVS Indemnification. AVS shall have no liability to Customer to the extent the infringement or claim thereof is the result of (i) use of the AVS Software or deliverables in combination with other products, devices or software which are not furnished to Customer by AVS, if the infringement would not have occurred but for the combination; (ii) modification of the AVS Software or deliverables by other than AVS, or (iii) use of other than a current unaltered version of the AVS Software or deliverables, if such infringement would have been avoided by use of the current unaltered version of the AVS Software or Deliverable. In the case of any services, this

8

indemnification shall not apply to deliverables based on specifications created by Customer or to deliverables that, in the absence of software or equipment provided by Customer, would not infringe the intellectual property rights of the affected party.

C.      Remedies for AVS Infringement. Should the AVS Software or deliverables become, or in the opinion of AVS be likely to become, the subject of a claim of such an infringement, then AVS shall (in addition to indemnifying Customer as provided in Section 8.1(a)), at its option and expense, either (i) procure for Customer the right to use the AVS Software or deliverables, or (ii) replace or modify the AVS Software or deliverables to make it non-infringing but otherwise substantially confirming to the description in Addendum A and any documentation provided therewith, or (iii) if the options described in clauses (i) and (ii) are not commercially practical, accept the return of the AVS Software or deliverables (or the infringing part thereof), terminate the licenses granted hereunder, and grant to Customer a refund either for the AVS Software or, in the case of services, for the time charged to the Customer for the infringing deliverables.

8.2     Indemnification by Customer.

A.      Indemnification. Customer shall indemnify and hold AVS harmless from and against, and shall defend, any claim, suit or proceeding (an "action"), and pay any reasonable attorneys fees and settlement amounts or damages awarded by a court of competent jurisdiction, arising out of claims by third parties that the Customer Seat Application or any Customer Server Application infringes any United States copyright, patent, trademark or trade secret, provided that AVS (i) notifies Customer promptly in writing of the action, (ii) provides Customer with reasonable information, cooperation and assistance in the defense or settlement of the action (at Customer's expense), and (iii) grants Customer sole authority and control of the defense or settlement of the action, subject to AVS's written consent of any proposed settlement, which shall be required solely if the terms of settlement are not confidential between the parties, and shall not be unreasonably withheld or delayed. AVS shall have no authority to settle any action on behalf of Customer, and no costs or expenses shall be incurred for the account of Customer without its prior written consent.

9

B.    Limitation of Customer Indemnification. Customer shall have no liability to AVS to the extent the infringement or claim thereof relates to the AVS Software incorporated in the Customer Seat Application or Customer Server Application. IN NO EVENT WILL CUSTOMER'S TOTAL LIABILITY UNDER SECTION 8.2 (EXCEPT FOR A MATERIAL BREACH OF ARTICLE 9, FOR WHICH NO LIMITATION OF LIABILITY EXIST) EXCEED THE TOTAL AMOUNT PAID TO AVS BY CUSTOMER DURING THE PRECEDING 12-MONTH PERIOD PURSUANT TO THIS AGREEMENT.

8.3    Entire Liability. SECTION 8 OF THIS AGREEMENT STATES THE ENTIRE LIABILITY OF AVS AND CUSTOMER WITH RESPECT TO CLAIMS OF INFRINGEMENT RELATING TO (i) AVS' PROVISION OF SERVICES OR AVS SOFTWARE OR ITS USE OR OPERATION, AND (ii) ANY CUSTOMER SEAT APPLICATION OR CUSTOMER SERVER APPLICATION.

9.    CONFIDENTIALITY.

9.1    Confidential Information. The parties agree not to permit access to or to disclose the other party's Confidential Information except to its authorized employees and contractors who are bound by confidentiality agreements and who need to use or have access to the other party's Confidential Information as permitted by this Agreement. A party shall use at least the same degree of care in protecting the other party's Confidential Information as such party generally exercises in protecting its own most valuable proprietary information, but not less than reasonable care, and shall inform its employees having access to the Confidential Information of its confidential nature. "Confidential Information" includes all software, code, documentation, specifications, drawings, documents, data, and other information provided by one party to the other and relating to the providing party's business and operations, including, without limitation, information disclosed orally, or visually where indicated to be confidential prior to disclosure and thereafter summarized and marked as confidential in a written memorandum delivered to the receiving party within thirty (30) days of the disclosure, as well as information clearly identified as "Confidential" or "Proprietary", or marked with a similar legend. However, the receiving party shall have no obligation of confidentiality with respect to any Confidential Information which: (a) is already known to the receiving party at the time of disclosure; (b) is or subsequently becomes publicly available through no wrongful act of the receiving party; (c) is disclosed to or provided to the receiving party by an unrelated third party without violation of any obligation to the disclosing

10

party; (d) is developed independently by the receiving party without use of or access to the disclosing party's Confidential Information; or (e) is required by law to be disclosed (provided that the receiving party promptly notifies the disclosing party and allows the disclosing party a reasonable time to oppose such legal requirement).

9.2 <u>Public Relations</u>. Customer and AVS agree to reasonably support each other in public relations and marketing efforts including, without but not limited to press releases, product announcements, case studies and customer references. Each party agrees to obtain the prior written consent of the other prior to publicly releasing any such effort. Customer consents to AVS' use of Customer's name and logo as a user of AVS Software, subject to Customer's prior written approval of any intended use and provided that all goodwill associated with Customer's name and logo will at all times remain the sole property of Customer.

10. <u>GENERAL</u>

10.1 <u>Governing Law</u>. This Agreement shall be governed in all respects by the laws of the State of Delaware without giving effect to principles of conflict of laws. The United Nations Convention for the International Sale of Goods shall not apply to this Agreement.

10.2 <u>Notices</u>. All notices or reports shall be in writing and shall be delivered by personal delivery, facsimile transmission, or by certified or registered mail, return receipt requested, and shall be deemed given upon personal delivery, five days after deposit in the mail, or upon acknowledgment of receipt of electronic transmission. Notices shall be sent to the addresses set forth on Addendum A or to such other address as either party may specify in writing.

10.3 <u>No Agency</u>. The parties are independent contractors. Nothing contained in this Agreement shall be construed as creating any agency, partnership, or other form of joint enterprise between the parties.

10.4 <u>Injunctive Relief</u>. Customer acknowledges that its breach of Sections 3.3, 3.4, 5.5 or 9 of this Agreement may cause AVS irreparable damage for which recovery of money damages would be inadequate. AVS acknowledges that its breach of Section 9 of this Agreement may cause Customer irreparable damage for which recovery of money damages would be inadequate. Therefore, each party agrees that the other party shall be entitled to seek injunctive relief to protect its rights under such sections of this Agreement in addition to any other remedies available to it.

10.5 <u>Force Majeure</u>. Neither party shall be liable to the other for any failure or delay in the performance of its obligations (except for the payment of money) caused by strikes, embargoes, unexpected government requirements, civil or military authorities, or by the public enemy or for any similar cause that is

11



beyond the reasonable control of such party.

10.6    Waiver. If one party fails to enforce a provision of this Agreement, it shall not be precluded from enforcing the same provision at another time.

10.7    Severability. If any provision of this Agreement is deemed unenforceable or invalid by law or by a court decision, the provision shall be changed and interpreted if possible to accomplish the intent of the provision within the constraints of the law. Only that provision, and not the entire agreement, shall be invalidated.

10.8    Assignment. Customer shall not assign this Agreement or any rights hereunder, except by operation of law or change of control, without the prior written consent of AVS, which consent shall not be unreasonable withheld. AVS shall notify Customer whether it consents to a proposed assignment within ten (10) business days of receipt from Customer of notice of its intention to assign, together with information on the factors set forth below. Any purported assignment without required consent shall be void and of no effect. In determining whether to consent to a proposed assignment by Customer, AVS shall act in good faith and shall consider factors such as the financial capability of the proposed assignee and whether the potential assignee competes with AVS. AVS may assign this Agreement without restriction. Any permitted assigns or successors shall be bound by all terms and conditions of this Agreement.

10.9    No Conflicting Terms. AVS shall not accept, and this Agreement does not operate as an acceptance of, any different or additional terms and conditions, and this Agreement shall prevail over any such different or additional provisions, of any order of Customer or any other instruments.

10.10    Entire Agreement. This Agreement supersedes all previous agreements, whether oral or written, with respect to its subject matter. This Agreement may only be changed in a writing signed by authorized representatives of each party.

10.11    Export. Customer acknowledges that the export or re-export of the AVS Software to certain countries, to certain persons, and/or for certain end-users, may be subject to the export control laws, regulations and requirements of the United States and third countries. Regardless of any disclosure made by Customer regarding its activities with respect to AVS Software, Customer shall abide by all laws, regulations and requirements of the United States and third countries and shall not export or re-export, directly or indirectly, any AVS Software without first obtaining all necessary export licenses or other approvals required under the laws, regulations and requirements of the United States and third countries.

10.12    Authorization. Each party represents that the individual signing below is

12

authorized to enter into this Agreement and to create a legally binding agreement on behalf of such party, executed as an instrument under seal, as of the date set forth below.

ADVANCED VISUAL SYSTEMS INC.     SYMYX TECHNOLOGIES, INC.

By: _____     By: _____

Print Name: FRED C. CARTWRIGHT   Print Name: Isy Goldwasser

Title: V.P. NORTH AMERICAN SALES  Title: President & COO

Date: 07/09/03                    Date: 07/09/03


SYMYX DISCOVERY TOOLS, INC.

By: _____

Print Name: Jerry L. Alleman

Title: CFO

Date: 07/09/03

13

## ADDENDUM A

### AVS Software and Fee Schedule

This Addendum, along with the Agreement into which it is incorporated by reference, defines specific terms and conditions as set forth in the Agreement.

1.  AVS SOFTWARE.

    1.1  "Open Viz Engine" meaning proprietary AVS Software code in object form constituting an infrastructure for generating and adding interactive visualization to a software application.

    1.2  "Open Viz Components" meaning data visualization components in object form constituting proprietary AVS Software that provides data access and/or visualization to add behavior to applications.

2.  CUSTOMER SEAT APPLICATIONS.

    2.1

3.  CUSTOMER SERVER APPLICATIONS.

    3.1

4.  EFFECTIVE DATE AND TERM.

    4.1  The Effective Date of this Agreement shall be July 9, 2003.

    4.2  The term of this Agreement shall be for three (3) years from the Effective Date. Thereafter, this Agreement shall be automatically renewed for separate, successive one (1) year periods, unless earlier terminated by either party providing written notice of its intent not to renew at least sixty (60) days prior to the commencement of any such renewal period.

5.  FEES.

    5.1  The initial annual fee ("Annual Fee") for internal application development using AVS Software by any number of Customer's employees; distribution of Customer Seat Applications and/or Customer Server Applications to any number of End Users; and support of AVS Software as defined in Addendum B to this Agreement shall be $ 60,000.

    5.2  The Annual Fee shall be payable in full as of the Effective Date of this Agreement and upon each successive anniversary of the Effective Date while this Agreement is in effect, and subject to increase based upon the following fee schedule ("Fee Schedule"):

14

FC

Net Revenue (defined as Gross Revenues of Customer less credits, returns, shipping charges, sales taxes, withholding taxes to the extent Customer does not benefit from credits relating to such Withholding Taxes as shown on the consolidated U.S. tax returns of Customer as filed, and custom duties, as converted into U.S. dollars, if applicable, using the rate published in the Wall Street Journal at the anniversary of each Effective Date) derived from and attributable solely to the stand-alone license of Customer Seat Applications and Customer Server Applications containing AVS Software sold during each twelve (12) months during the Term of this Agreement commencing with the first anniversary of the Effective Date:

Annual Fee payable by Customer to AVS, as converted into U.S. dollars, if applicable, using the rate published in the Wall Street Journal at each anniversary of the Effective Date:

| | |
|---|---|
| $0 to $3,000,000 | $60,000 |
| $3,000,001 to $10,000,000 | $90,000 |
| $10,000,001 to $20,000,000 | $150,000 |
| $20,000,001 to $100,000,000 | $220,000 |
| Greater than $100,000,001 | $300,000 |

For purposes of this Agreement, Gross Revenues of Customer shall be defined as revenue derived by Customer from and expressly attributable to the license to third parties of Customer Seat Applications and Customer Server Applications containing AVS Software. Gross Revenues of Customer for the purpose of this Agreement specifically excludes:

(a) revenue derived by Customer from the sale of Discovery Tools® Systems, notwithstanding that Customer Seat Applications and Customer Server Applications licensed in conjunction with the sale of such Discovery Tools Systems may contain AVS Software;
(b) revenue derived by Customer for undertaking research and development contracts, notwithstanding that in conducting the Research and Development services and reviewing the results of such services, employees, consultants or contractors of Customer, and/or End Users may use Customer Seat Applications and Customer Server Applications containing AVS Software; and
(c) revenue derived by Customer as milestone, royalties, technology access fees, intellectual property licensing fees and research and development success fees;

In the event that Customer Seat Applications and Customer Server Applications containing AVS Software are licensed to third parties in conjunction with Customer's other software products or applications that do not contain AVS Software, or are bundled together with implementation, integration, support or other such services, then Customer will perform a reasonable allocation of the revenue derived from such transactions, such that Gross Revenues of Customer for the purpose of this

15

Agreement will only include that portion of revenue derived by Customer from the license of Customer Seat Applications and Customer Server Applications containing AVS Software

5.3    If, after the first anniversary of the Effective Date, Customer, for any reason, ceases development of Customer Seat Applications and Customer Server Applications, customer shall retain the right to sublicense and distribute AVS Software solely as integrated into the then-extant versions of Customer Seat Applications and Customer Server Applications for advance payment of sixty-five percent (65%) of the Annual Fee as would be payable using the Fee Schedule.

5.4    To ensure compliance with the terms of this Agreement, AVS shall have the right, not more than once per year and upon thirty (30) days notice, to have an inspection and audit of all the books and records of Customer, conducted by an independent certified public accountant reasonably acceptable to both parties, whose fee is paid by AVS. Such audit shall be conducted during regular business hours at Customer's offices and in such a manner as not to interfere with Customer's normal business activities. Customer will promptly pay AVS any amounts determined to have been underpaid.

5.5    The Annual Fee paid in the first year of this Agreement entitles Customer to five (5) days of eight (8) hours each of training in the use of the AVS Software, subject to the following terms and conditions:

A.    A prescribed training syllabus is followed for the first three(3) days of the training course. The content of final two (2) days of the training may be defined in advance of the training in consultation with AVS.

B.    AVS will provide the training in accordance with generally accepted industry standards. If an AVS employee or subcontractor providing training under this Addendum is unable to complete the task (for example, due to sickness or resignation), AVS will use its commercially reasonable efforts to provide another employee or subcontractor of similar experience to fulfill the contract.

C.    Customer shall reimburse AVS for all reasonable travel, accommodation, subsistence and other expenses incurred by AVS in connection with the performance of training services.

D.    For a period of one (1) year after AVS has completed the Services, each of AVS and Customer agrees that it will not, directly or indirectly, solicit, interfere with or try to entice away any employee of the other party.

16

6.    NOTICES.

6.1    To AVS:              Advanced Visual Systems Inc.
                           300 Fifth Avenue
                           Waltham, MA 02451
                           Tel: (781) 890-4300
                           Fax: (781) 890-8287
                           Email: info@AVS.com

6.2    To Customer:        Symyx Technologies Inc.
                           3100 Central Expressway
                           Santa Clara, CA 95051
                           Tel: (408) 764-2000
                           Fax: (408) 748-0175

                           With copies to:

                           Symyx Discovery Tools, Inc.
                           1263 East Arques Ave
                           Sunnyvale, CA 94085
                           Tel: (408) 764-2000
                           Fax: (408) 748-0175

                           and
                           Vice President, Alliances and Legal Affairs

This Addendum is incorporated into and made a part of the Agreement between AVS and Customer, and is subject to the terms thereof.

ADVANCED VISUAL SYSTEMS INC.    SYMYX TECHNOLOGIES INC.

By: _____       By: _____

Print Name: FRED C. CARTWRIGHT  Print Name: _Icy Gottwasser_

Title: V.P. NORTH AMERICAN SALES  Title: _President & COO_

Date: 07 / 09 / 03             Date: 07 / 09 / 03

                               SYMYX DISCOVERY TOOLS, INC.

                               By: _____

                               Print Name: _Jery L. Hillman_

                               Title: _CFO_

17

Date: _____07/09/03_____

18

## ADDENDUM B
## Customer Support

This Addendum, along with the Agreement into which it is incorporated by reference, addresses AVS' maintenance and support obligations after expiration of the warranty period as set forth in the Agreement.

SUPPORT SERVICES.

1.1    AVS agrees to provide maintenance and support services for the current version and one prior version of AVS Software licensed under this Agreement, as utilized in association with the Customer Seat Applications and/or Customer Server Applications specified in Addendum A to this Agreement. Specific services are described in the support program description provided to Customer and incorporated herein by reference.

1.2    Telephone and/or e-mail support services ("Support") will be available during AVS' normal business hours of Monday through Friday, 9:00 a.m. to 5:30 p.m. Eastern time, excluding holidays observed by AVS, which will be substantially consistent with prevailing U.S. business practices.

1.3    Support shall be provided for the purpose of investigating AVS Software errors that have been reported and documented in writing by Customer. Customer shall submit to AVS a listing of output, code, a clear description of the problem and error message(s), information regarding the equipment and operating system on which the AVS Software is loaded, and any other data that AVS reasonably may request in order to reproduce the conditions under which the error occurred. AVS will acknowledge to Customer receipt of a reported error and will verify Customer-detected errors, provided that the error can be recreated with an unmodified release of the AVS Software. AVS will use commercially reasonable efforts to develop a work-around for the error.

1.4    Unless otherwise defined in writing as part of Addendum B to this Agreement, Support will be provided according to the following schedule:

| Annual Fee paid by Customer to AVS, as converted into U.S. dollars, if applicable, using the rate published in the Wall Street Journal at the Effective Date and each subsequent anniversary of the Effective Date: | Number of Customer's designated representatives ("Named Support Contacts") who may utilize Support pursuant to the provisions of Addendum B to this Agreement: |
|---|---|
| $0 to $60,000 | 1 |
| $60,001 to $90,000 | 2 |
| $90,001 to $150,000 | 3 |
| $150,001 to $220,000 | 4 |

19



| Annual Fee paid by Customer to AVS, as converted into U.S. dollars, if applicable, using the rate published in the Wall Street Journal at the Effective Date and each subsequent anniversary of the Effective Date: | Number of Customer's designated representatives ("Named Support Contacts") who may utilize Support pursuant to the provisions of Addendum B to this Agreement: |
|---|---|
| $221,000 to $300,000 | 5 |

1.5 Named Support Contacts shall be specified by Customer in writing to support@avs.com. Named Support Contacts will be responsible for reporting any detected errors in the AVS Software to AVS. No other employee or representative of Customer shall be authorized to report any error or partake in Support. AVS shall be under no obligation to respond to any unauthorized reports, which shall include reports provided by any other means than telephone or email to support@avs.com. Customer may change its designated representative upon five (5) days' advance written notice to support@avs.com.

1.6 Customer agrees to cooperate with AVS to the extent necessary for AVS to perform its Support. Such cooperation shall include, but not be limited to, providing AVS with all necessary information requested by AVS personnel. Customer further agrees that before availing itself of Support, it shall attempt to resolve any apparent problem by using the documentation in its possession.

1.7 AVS will be responsible only for supporting AVS Software and not for Customer's own software application. In its sole discretion, AVS may cease providing support services or limit availability of such services to Customers who, in AVS's reasonable judgment, are abusing the customer support system. By way of example and not by way of limitation, such abuse may include excessive requests for assistance unrelated to errors in the AVS Software and lack of cooperation with the reasonable requests of AVS personnel for error documentation.

*[SIGNATURE PAGE FOLLOWS]*

20

This Addendum is incorporated into and made a part of the Agreement between AVS and Customer, and is subject to the terms thereof.

ADVANCED VISUAL SYSTEMS INC.

By: _Fred C Cartwright_

Print Name: _FRED CARTWRIGHT_

Title: _V.P. North American Sales_

Date: _07 / 09 / 03_

SYMYX TECHNOLOGIES INC.

By: _____

Print Name: _Isy Goldwasser_

Title: _President & COO_

Date: _07/09/03_

SYMYX DISCOVERY TOOLS, INC.

By: _____

Print Name: _Jeryl L. Hilleman_

Title: _CFO_

Date: _07/09/03_

21

# EXHIBIT B

CONFIDENTIAL

## AMENDMENT No. 2
### to MASTER LICENSING, DEVELOPMENT & DISTRIBUTION AGREEMENT

This Amendment ("**Amendment 2**") is made to the Master Licensing, Development and Distribution Agreement and its Amendment (collectively the "**Agreement**") between Advanced Visual Systems Inc., a Nevada Corporation ("**AVS**") and Symyx Technologies, Inc., a Delaware corporation ("**Symyx**"). The effective date of this Amendment is June 29, 2013 (the "Amendment Date").

### Recitals

WHEREAS, AVS and Symyx entered into the Agreement on April July 9, 2003 and amended the Agreement on June 6, 2006 and acknowledge that the Agreement is in full force and effect; and

WHEREAS, Symyx became known as Accelrys, Inc., a Delaware corporation, ("**Accelyrs**") on July 1, 2010 through a sale of all of Symyx' assets to Accelrys; and

WHEREAS Accelrys has licensed certain commercial software products that are recognized as Customer Seat Application(s) and Customer Server Application(s) under the Agreement to Freeslate, Inc., a Delaware corporation ("**Freeslate**"); and

WHEREAS, Accelrys wishes to assign its rights and obligations under the Agreement to Freeslate and Freeslate wishes to accept all rights and obligations from Accelrys; and

WHEREAS, Accelrys wishes to become a Subdistributor of Freeslate and distribute Customer Seat Application(s) and Customer Server Application(s) to End Users as provided under the Agreement, and Freeslate wishes to accept Accelrys as a Subdistributor; and

WHEREAS, AVS wishes continue its business relationship with each of the parties as set forth herein and in the Agreement and modify select provisions as set forth in this Amendment 2; and

NOW THEREFORE, in consideration of their respective promises contained herein, AVS and Accelrys and Freeslate agree as follows:

### Amended Agreement

1. <u>Customer.</u>  Effective with Amendment Date, the definition of Customer in all future interpretations of the Agreement shall mean Freeslate.

2. <u>Accelrys.</u>  Accelrys hereby acknowledges that it acquired all of assets and liabilities of Symyx on July 1, 2010 and that it has full right and authority to act on behalf of Symyx in this Amendment with respect to an assignment to Freeslate, and that it has faithfully honored all obligations to AVS under the Agreement since the Effective Date up to and including the Amendment Date and that it shall faithfully honor all obligations to AVS and Freeslate as set forth in the Agreement in its capacity of Subsdistributor. Accelrys acknowledges that effective with the Amendment Date that it shall have no right to use the AVS Software except as provided in sections 3.1B, 3.1D, 3.1E, 3.3 A, B, C, D, E and 3.4 of the Agreement. <u>USE OF THE AVS SOFTWARE FOR ANY NEW PRODUCT DEVELOPMENT BY ACCELRYS IS EXPRESSLY PROHIBITED.</u> Furthermore, Accelrys agrees to abide by the provisions of Sections 5.5 and 5.6 in perpetuity and acknowledges that all warranties and Support obligations of AVS shall terminate effective with the Amendment Date.

1

CONFIDENTIAL

3. Freeslate. Freeslate hereby accepts an assignment of all of the rights and obligations of the Agreement from Accelrys effective with the Amendment Date.

4. AVS. AVS hereby consents to an assignment of the Agreement from Accelrys to Freeslate, as required under section 10.8 of the Agreement.

5. Fees. Section 5 of Addendum A of the Agreement and section 6 of Amendment No. 1 to the Agreement shall be stricken in their entirety and Section 5 of Addendum A shall be replaced with the following:

5.1. Annual Fee. Provided that payment is received prior to June 30, 2013, the annual fee ("Annual Fee") for 2 consecutive years (commencing on the Amendment Date) of distribution of Customer Applications to any number of End Users shall be $70,000. . If payment is not received prior to June 30, 2013 the amounts set forth in the Fee Schedule shall apply.

5.2. Payment of Annual Fees. The Annual Fee shall be payable in full as of the Amendment Date and upon each successive and applicable anniversary of the Amendment Date while this Agreement is in effect, and subject to increase based upon the following fee schedule ("Fee Schedule"):

| "Net Revenue" (defined as gross revenues of Customer less credits, returns, shipping charges, sales taxes, and custom duties, as converted into U.S. dollars, if applicable, using the rate published in the Wall Street Journal at the anniversary of each Amendment Date) derived from Customer Applications created with or containing AVS Software sold during each 12 months during the Term of this Agreement commencing with the first anniversary of the Amendment Date: | Annual Fee payable by Customer to AVS, as converted into U.S. dollars, if applicable, using the rate published in the Wall Street Journal at each anniversary of the Amendment Date for internal application development using AVS Software by any number of Customer's employees for the Customer Applications authorized herein and distribution of said Customer Applications to any number of End Users: |
|---|---|
| $1,000,001 to $3,000,000 | $60,000 |
| $3,000,0001 to $10,000,000 | $70,000 |
| $10,000,001 to $20,000,000 | $90,000 |
| $20,000,001 to $50,000,000 | $130,000 |
| $50,000,000+ | Custom quotation provided by AVS as required |

5.3. Calculation of Net Revenue in the case of integrated software and services offerings. In the event that Customer does not charge End Users for Customer Applications or Customer Applications are bundled with solutions or services and have no retail or ascertainable value, Net Revenue shall be defined as follows: Gross revenues of Customer less credits, returns, shipping charges, sales taxes, and custom duties, as converted into U.S. dollars, if applicable, using the rate published in the Wall Street Journal at the anniversary of each Amendment Date, derived from Customer solutions or services containing Customer Applications creat-

2

CONFIDENTIAL

ed with or containing AVS Software sold during each 12 months during the Term of this Agreement, commencing with the first anniversary of the Amendment Date.

5.4. **Calculation of Annual Fees in the event of cessation of development of Customer Applications.** After the expiration of the first year anniversary of this Amendment (or, in the case of Customers payment to AVS of $70,000 pursuant to Section 5.1 of this Amendment, after the expiration of the second anniversary of this Amendment), if Customer, for any reason ceases use of the AVS Software (which shall be deemed first used as of the Amendment Date) and provides Notice to AVS at least 60 days prior to any anniversary of the Amendment Date, Customer shall retain the right to sublicense and distribute AVS Software solely as integrated into the then-extant versions of Customer Applications for the life of then-extant sublicenses for advance payment of 65% of the Annual Fee as would be payable using the Fee Schedule for each year of the Agreement that is subject to this provision, provided that payment is made on or before the expiration of any anniversary of the Agreement. IT IS EXPRESSLY UNDERSTOOD THAT THE PROVISIONS OF THIS PARAGRAPH PROHIBIT CUSTOMER FROM MAKING ANY ENHANCEMENTS OR IMPROVEMENTS TO CUSTOMER APPLICATIONS AND THAT USAGE OF THE AVS SOFTWARE IS LIMITED EXCLUSIVELY TO THE ESSENTIAL MAINTENANCE OF CUSTOMER APPLICATIONS BY APPLICATION DEVELOPERS.

5.4.1. If the cessation option of this Section is exercised by Customer and Customer at a later date wishes to restore any unrestricted right to use the AVS Software, all amounts not paid to AVS as a result of this provision must be paid in full before Customer commences unrestricted use of the AVS Software.

5.4.2. Should the provisions of this Section 5.4 become effective, the Agreement shall be in full force and effect and deemed not terminated until such time as Customer shall provide Notice of termination, in which case the applicable provisions of Section 5.4 shall prevail.

5.4.3. If Customer pays AVS $70,000 pursuant to Section 5.1 of this Amendment and wishes at anytime during the first 2 consecutive years to restore any unrestricted right to use the AVS Software imposed by Section 5.1, Customer shall provide notice to AVS with remittance of an amount equal to the pro rata share of the applicable Annual Fee that Customer would have paid for such unrestricted right under the Fee Schedule. By way of example and for illustrative purposes only, if 10 months after the Amendment Date Customer wishes to add new features to any Customer Application using the AVS Software, Customer must remit $29,166 to AVS ($120,000 cost of 2 years of Annual Fees at $60,000 per year) less ($70,000 paid to AVS as of the Amendment Date) equals $50,000 (divided by 24 months in the 2 year initial term) equals ($2,083 for each month of initial 2 year term) multiplied by (14 months remaining in the initial 2 year term).

5.5. **Right to audit.** To ensure compliance with the terms of this Agreement, AVS shall have the right, not more than once per year and upon 30 days Notice, to have an inspection and audit of all the books and records of Customer, conducted by an independent certified public accountant reasonably acceptable to both parties, whose fee is paid by AVS. Such audit shall be conducted during regular business hours at Customer's offices and in such a manner as not to interfere with Customer's normal business activities. Customer will promptly pay AVS any amounts determined to have been underpaid plus reasonable and actual costs incurred in the enforcement of this Section 5.5.

3

CONFIDENTIAL

5.6. <u>Support Fee amount and payment terms.</u> The support fee ("**Support Fee**") for Support of the AVS Software as defined in Addendum B to this Agreement shall be included in each Annual Fee payment.

6. <u>Notices.</u> The Notices section of Addendum A is replaced in its entirety as follows:

To AVS: 300 Fifth Ave., Waltham, MA 02451, Attn: CEO

To Freeslate: 415 Oakmead Parkway, Sunnyvale, CA 94085, Attn: CFO

To: Accelrys: 5005 Wateridge Vista Drive, San Diego, CA 92130, Attn: CFO

7. <u>Services.</u> The following section is added to Addendum A:

7.1. <u>CUSTOMER SERVICES.</u>

a. For each year that this Agreement is in effect and Customer pays the full applicable Annual Fee, Customer shall be entitled to the applicable number of hours of AVS services ("**Customer Service Allowance**") from the following table:

| Minimum Annual Fee paid by Customer to AVS | Number of hours included in Customer Service Allowance in each applicable year of the Agreement | |
|---|---|---|
| $50,000 | 24 | |
| $70,000 | 48 | |
| $90,000 | 72 | |
| $130,000 | 80 | |

b. The Customer Service Allowance may be applied to any of the following AVS services. To the extent that Customer exceeds the hours in the Customer Service Allowance, the rates specified under the Professional Services subsection that follows shall be applicable:

i. <u>Training.</u>

1. <u>Location of training.</u> Training can be conducted at any site designated by Customer, provided that all facility costs related to training are paid for by Customer.

2. <u>Training process.</u> A prescribed training syllabus is followed for a 3 day standard OpenViz training course.

4

CONFIDENTIAL

3. <u>Delivery of training</u>. AVS will provide the training in accordance with generally accepted industry standards. If an AVS employee or subcontractor providing training under this Addendum is unable to complete the task (for example, due to sickness or resignation), AVS will use commercially reasonable efforts to provide another employee or subcontractor of similar experience to fulfill the contract.

4. <u>Training expenses</u>. Customer shall reimburse AVS for all reasonable travel, accommodation, subsistence and other expenses incurred by AVS in connection with the performance of training services if approved by Customer in advance and provided AVS submits proper receipts in support of any expense(s) incurred.

ii. <u>Advisory Services</u>.

1. <u>Advisory practice</u>. AVS will provide advice and instructions on the use, implementation and architecture of the AVS Software ("**Consultations**") but will not author or supply code using the AVS Software or any other technology for Customer unless it is delivered under a Statement of Work as defined below under Professional Services. Each Consultation request shall be so identified at the time of request and made exclusively by a Named Support Contact.

iii. <u>Professional Services</u>.

1. <u>Statements of Work</u>. As requested by Customer and subject to written acceptance by AVS, AVS will provide professional services ("**Professional Services**") described in exhibits, schedules, or statements of work (hereafter "**Statements of Work**"). Each Statement of Work shall include, at a minimum, a description of Professional Services to be performed, an estimate of time and materials charges, and any additional terms to which the parties agree.

2. <u>Conflicts between Statements of Work and this Agreement</u>. If a provision contained in a Statement of Work conflicts with a provision the Agreement or its Addenda, the provision in the Statement of Work shall prevail, provided that the Statement of Work was signed by an Authorized Representative of both Customer and AVS. In the absence of joint authorization by an Authorized Representative, this Agreement shall govern without exception in the event of a conflict between a Statement of Work and the Agreement.

3. <u>AVS conduct and performance</u>. AVS will provide Professional Services in accordance with generally accepted industry standards. It will have appropriate agreements with its employees and subcontractors to enable it to comply with its obligations under this agreement. If an AVS employee or subcontractor providing Professional Services under this Addendum is unable to complete the task (for example, due to sickness or resignation), AVS will use its best efforts to provide another employee or subcontractor of similar experience to fulfill the contract.

5

CONFIDENTIAL

4. Customer's obligations. Customer agrees to provide a suitable working environment for AVS' staff when they are required to work on the Customer's site. It also agrees that its personnel will respond in a timely manner to inquiries from AVS employees relative to Professional Services to be performed under any Statement of Work. Customer acknowledges and agrees that AVS' performance is dependent in part on Customer's actions. Accordingly, any dates or time periods relevant to performance of any Professional Services by AVS shall be equitably extended to account for any delays due to Customer.

5. Charges for Professional Services. Should Customer exceed the Customer Service Allowance, Customer shall pay AVS for Statements of Work (or other services) on a time and materials basis pursuant to the following fee schedule(s):

| Rates for PREPAID Statements of Work | |
|---|---|
| Number of 8 hour days of service prepaid by Customer prior to the commencement services | Corresponding daily rate for on-site or off-site services |
| 1-6 | $2,400.00 |
| 7-12 | $2,160.00 |
| 13-24 | $2,040.00 |
| 25-37 | $1,920.00 |
| 38-49 | $1,800.00 |
| 50+ | $1,560.00 |

6. Pre-purchased days may be applied towards any customer service provided by AVS.

7. Pre-purchased days must be used within one year of the date of invoice.

| Rates for NON-PREPAID Statements of Work | |
|---|---|
| Number of 8 hour days of service delivered | Corresponding daily rate for on-site or off-site services |
| Any | $2,400.00 |

8. Annual adjustment of Fees for Professional Services. Upon each anniversary of the Effective Date all fees for Professional Services shall increase by 5% per annum.

9. Travel expenses. Customer shall reimburse AVS for all pre-approved and reasonable travel, accommodation and sustenance expenses incurred by AVS in connection with the performance of Professional Services, subject to the presentation of receipts for such expenses.

10. Payment terms for Professional Services. AVS will invoice Customer for Professional Services and related out-of pocket expenses on a regu-

CONFIDENTIAL

lar basis as specified in the Statement of Work, and Customer shall pay such invoiced amounts as agreed herein. If Customer fails to make payments when due, AVS, in addition to its other rights and remedies, will have the right to terminate Professional Services immediately. If Customer enters into a Statement of Work with provisions for prepayment of Professional Service charges, work will not commence until payment has been received.

11. <u>Ownership of Statement of Work product</u>. All newly-created software and intellectual property arising out of any Professional Services provided under this Addendum that incorporates Confidential Information of Customer or intellectual property of Customer that is protected by trade secret or patent ("**Customer IP**") including without limitation that in any programs, operating manuals, techniques, specifications and documentation shall become the exclusive property of Customer.

12. <u>Uninterrupted use of Statement of Work product</u>. AVS grants Customer perpetual, irrevocable and non-exclusive permission to use any newly created software and intellectual property (other than the AVS Software) that is not Customer IP, subject to the terms of this Agreement.

13. <u>Use of techniques and procedures involved in delivery of Statement of Work product</u>. AVS shall be permitted the use (without cost, required permission or any other restriction) of any visualization, programming, data access, data management, data manipulation or other technique that may be discovered or developed in connection with this Agreement, provided and to the extent that such techniques do not infringe upon Customer IP and do not make use of Confidential Information of Customer.

14. <u>Ownership of AVS Software</u>. During the term of this Agreement or following its termination, under no circumstances shall Customer be granted any right, title or interest in the AVS Software in its object or source code form. AVS retains exclusive ownership of all copyrights, patents, trade secrets and other proprietary rights in and to any of its software products, including, without limitation, the techniques, code, algorithms and processes contained therein.

c. <u>Limitations on customer service allowances</u>.

   i. <u>Expiration of Customer Service Hours</u>. The annual Customer Service Allowance must be used within each applicable 12 month period. Unused Customer Service Allowance hours shall expire at each anniversary of the Amendment Date. In the event that Customer exercises the Multiyear Prepayment option, the total Customer Service Allowance for the full period of Multiyear Prepayment may be utilized at any time during the applicable Multiyear Prepayment period and unused hours shall expire only at the end of the applicable Multiyear Prepayment period.

   ii. <u>Provision for non-payment of Annual Fees</u>. Utilization of the Customer Service Allowance may be specified by Customer at the commencement of each anniversary year of the Agreement. If, however, Customer fails to make any sched-

uled installments of the Annual Fee as required under the Agreement and causes a breach of the Agreement, AVS shall be entitled to immediately invoice Customer (at the rate specified under Professional Services) for the pro rata share of Customer Service Allowance hours for which no payment was made and service was provided, and Customer shall immediately pay AVS for such hours.

iii.  Provision for cessation of development using the AVS Software. In the event that Customer exercises its rights under Section 5.4 of Addendum A, the Customer Service Allowance shall be reduced to 8 hours per year.

iv.  Work limited to projects associated with the AVS Software. Customer Service Hours will be delivered by AVS exclusively for assignments that are directly related to the development of Customer Application(s) authorized hereunder. In the event of a Change of Control by Customer, AVS shall be under no obligation to provide Professional Services related to an assignment that transfers functionality of the AVS Software to software or processes other than a Customer Application authorized hereunder.

v.  Work for Hire. It is expressly understood that any Professional Services or Customer Service Allowance hours delivered by AVS under this Agreement shall not be construed as "work for hire".

Except as expressly set forth herein or otherwise required to accord with the intent hereof, the remaining provisions of the Agreement shall be unchanged and shall remain in full force and effect from and after the date hereof.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed by their duly authorized representatives.

ADVANCED VISUAL SYSTEMS INC.

By: _____

Print Name: Steve Sukman

Title: CEO

Date: 27 Jun 2013

ACCELRYS, INC.

By: _____

Print Name: _MICHAEL A. PIRAINO_

Title: _SVP & CFO_

Date: _6/27/2017_

FREESLATE, INC.

By: _____

Print Name: _RICHARD ROSENTHAL_

Title: _CFO_

Date: _6/27/2013_

8

# EXHIBIT C

 

Q    ⊙ Virtual service agent

Home / AVS Support Help Center / SUPPORT-962

# OpenViz dependency on .Net 1.1

 **Shashi Kamath** raised this on 2025-Jun-04 1:31 PM                    **Hide details**

### Description

We are in the process of upgrading a legacy application which is using AVS\OpenViz version 2.6 . But this version of openviz is dependent on the .net framework 1.1. We would like to upgrade the .net version to 4.8.1. We would like to know if there is a version of openviz which is compatible with .net framework 4.8 ? At present the application crashes [ c++ projects are compiled in vs 2010 with /clr option on in c++ project].

**Priority**

High

**OpenViz Editions**

Particles

**OpenViz Codebase**

.NET

**OpenViz Versions**

2.6

**Operating System(s)**

Windows 64-bit

**Company Name**

Unchained Labs

**Company Address**

4747 Willow Road Pleasanton CA, USA

· **AVS Invoice/Order/Customer Number**

We acquired a company that used this control

## Activity

 **Shashi Kamath**  2025-Jun-04 1:31 PM



openviz.png
04 Jun 2025, 01:30 PM

 **Automation for Jira**  2025-Jun-04 1:31 PM

Thanks for contacting us! We just wanted to let you know that your message was received and a member of our support team will be responding to you as soon as possible.

If you have any additional comments or questions you'd like to add while you wait to hear back, please feel free to update your support ticket.

Thanks,
AVS Support

 **AVS Support**  2025-Jun-05 10:29 AM

Hi,

In order to provide support, we first need to validate your original license/support contract.

Please provide us with the details of the previous company and a way to verify transfer of license via acquisition.

Thanks,

AVS Support

 **Shashi Kamath**  2025-Jun-05 12:52 PM

Please see the attached file for the licensing information. I have ccd Serena also here, who is the original license holder from Free slate. She is part of Unchained Labs now.

**Shashi Kamath**

Sr.Dir Software Eng.

925.482.4240

unchainedlabs.com

# EXHIBIT D

- **AVS Invoice/Order/Customer Number**

  We acquired a company that used this control

## Activity

 **Shashi Kamath**  2025-Jun-04 1:31 PM



openviz.png
04 Jun 2025, 01:30 PM

 **Automation for Jira**  2025-Jun-04 1:31 PM

Thanks for contacting us! We just wanted to let you know that your message was received and a member of our support team will be responding to you as soon as possible.

If you have any additional comments or questions you'd like to add while you wait to hear back, please feel free to update your support ticket.

Thanks,
AVS Support

 **AVS Support**  2025-Jun-05 10:29 AM

Hi,

In order to provide support, we first need to validate your original license/support contract.

Please provide us with the details of the previous company and a way to verify transfer of license via acquisition.

Thanks,

AVS Support

 **Shashi Kamath**  2025-Jun-05 12:52 PM

Please see the attached file for the licensing information. I have ccd Serena also here, who is the original license holder from Free slate. She is part of Unchained Labs now.

**Shashi Kamath**

Sr.Dir Software Eng.

925.482.4240

unchainedlabs.com



**OpenVizLicenseKeys.txt**
05 Jun 2025, 12:52 PM

*(0.8 kB)*



**AVS Support** 2025-Jun-05 3:43 PM

Hi Shashi,

Can you please detail any development or deployment of the application embedding OpenViz since 2016?

Also, when you say you are upgrading the application, what does this mean?

Thanks,

AVS Support



**Shashi Kamath** 2025-Jun-05 4:10 PM

This is a much older application called PolyView. We have not done any changes to this app in the last 10+ years.

It does get deployed as a part of a software package called LEA, one of our lab automation products. We use openviz to show some 2D / 3D data in that application.

We have a customer pressing us to get rid of older .net ( anything below 4.8) dependency for security concerns.

We are committed to doing that now. So, we need a version of OpenViz that uses later version of .net.

**Shashi Kamath**

Sr.Dir Software Eng.

925.482.4240

unchainedlabs.com



**AVS Support** 2025-Jun-05 4:43 PM

Hi Shashi,

Unfortunately, I do not have good news.

Freeslate terminated Development, Support, and Deployment rights on April 13. 2016. This means that you cannot further any efforts beyond the last build from 2016.

Freeslate and AVS have not agreed that any previous agreement has been transferred to you at Unchained Labs (this would require a contract Amendment with legal).

Unchained Labs does not have any agreement with AVS.

Just to be clear, **you do not have any rights to use OpenViz in any way.**

If you have any further questions or inquiry, please let me know and I would be happy to connect you.

Thank you,

AVS Support



**Shashi Kamath**  2025-Jun-05 4:51 PM

Can we buy a newer version of openviz ?

If yes, does it work with .net 4.8 without older versions?

What's the cost of the control ?

> Signature



**AVS Support**  2025-Jun-05 5:04 PM

Hi Shashi,

I'd be happy to put you in touch with someone who could help you further in regard to licensing and support of OpenViz. (It is based on derived revenue in which the product is embedded, so please have that number ready for your discussion.)

Please provide your email, contact number, and a best time to be reached (please include your time zone).

To answer your technical question, it appears you are using v2.6. I believe that we do have later versions in v2 that would work with .NET 4.8 (still COM with .NET interops). We also have v4 which is a pure .NET version and would require you to update your codebase.

We would need to get more information about your development environment, language being used, if you are intending to move to the latest version of OpenViz, etc. and your deployment plan.

OpenViz is an API that is being used in your control, so not sure about your build environment outside of our API.

Thanks,

AVS Support

 **Shashi Kamath**  2025-Jun-05 6:13 PM

We don't want to use a newer control that would require us do any coding.

We would like to get a later version of the control that simply works with newer .net and keeps all the functionalities that we currently have.

Looking for more of a drop-in replacement of DLLs.

Development environment :

Window 11

C++ / C# project Visual studio 2019 / 2002

.net framework 4.8

Weekdays any time before 8 AM PST is a good time for a call if you need to reach me my phone. Phone number is in my signature.

Emailing is the best option to get details.

**Shashi Kamath**

Sr.Dir Software Eng.

925.482.4240

unchainedlabs.com

 **Shashi Kamath**  2025-Jun-09 2:23 PM

Is someone going to contact me on this ?

**Shashi Kamath**

Sr.Dir Software Eng.

925.482.4240

unchainedlabs.com

 **Anoop Chatterjee**  2025-Jun-09 3:18 PM

Hi Shashi,

I just tried calling your phone number and it went straight to voicemail.

I will try you again.

Thanks,

Anoop

 **Shashi Kamath** 2025-Jun-09 3:27 PM

My phone was set to silence unknown callers to avoid spam calls. I turned it off now. You can call again in the next 15 mins or so I'll answer.

> Signature

 **Anoop Chatterjee** 2025-Jun-09 3:57 PM

Hi Shashi,

Per our discussion, from a technical standpoint your issues can all be addressed, we just need to resolve our licensing issue.

I look forward to speaking with you next Wednesday with an update regarding the appropriate people to forward our discussion.

Best,

Anoop

 **Automatic response** 2025-Jun-10 9:44 AM

Your request status has changed to Waiting for customer.

 **Shashi Kamath** 2025-Jun-10 1:29 PM

Hi Anoop,

Could you please give me your email address ? I want to pass that on to my manager.

**Shashi Kamath**

Sr.Dir Software Eng.

925.482.4240

unchainedlabs.com

 **Anoop Chatterjee** 2025-Jun-10 2:32 PM

Hi Shashi,

Sure, my email is: anoop@avs.com

I've also sent you an email with all my information. Please let me know you received it yesterday.

Thanks,

Anoop

 **Anoop Chatterjee** 2025-Jun-18 10:57 AM

Hi Shashi,

Just wanted to check in and see if you had any updates for me in regard to whom to speak with.

I have not received any emails as of yet, so any direction would be appreciated.

Thanks,

Anoop

 **Anoop Chatterjee** 2025-Jun-18 4:22 PM

Hi Shashi,

I have tried to call you today at 416pm and was forwarded directly to voicemail.

I look forward to your response.

Thank you,

Anoop

    Add a comment

## Status

**WAITING FOR CUSTOMER**

## Request type

OV   OpenViz Question

## Shared with

 Shashi Kamath
Creator

╋ Share

Powered by 🔷 Jira Service Management

# EXHIBIT E



**OpenVizLicenseKeys.txt**
05 Jun 2025, 12:52 PM

*(0.8 kB)*



**AVS Support**  2025-Jun-05 3:43 PM

Hi Shashi,

Can you please detail any development or deployment of the application embedding OpenViz since 2016?

Also, when you say you are upgrading the application, what does this mean?

Thanks,

AVS Support



**Shashi Kamath**  2025-Jun-05 4:10 PM

This is a much older application called PolyView. We have not done any changes to this app in the last 10+ years.

It does get deployed as a part of a software package called LEA, one of our lab automation products. We use openviz to show some 2D / 3D data in that application.

We have a customer pressing us to get rid of older .net ( anything below 4.8) dependency for security concerns.

We are committed to doing that now. So, we need a version of OpenViz that uses later version of .net.

**Shashi Kamath**

Sr.Dir Software Eng.

925.482.4240

unchainedlabs.com



**AVS Support**  2025-Jun-05 4:43 PM

Hi Shashi,

Unfortunately, I do not have good news.

Freeslate terminated Development, Support, and Deployment rights on April 13. 2016. This means that you cannot further any efforts beyond the last build from 2016.

Freeslate and AVS have not agreed that any previous agreement has been transferred to you at Unchained Labs (this would require a contract Amendment with legal).

Unchained Labs does not have any agreement with AVS.

Just to be clear, **you do not have any rights to use OpenViz in any way.**

If you have any further questions or inquiry, please let me know and I would be happy to connect you.

Thank you,

AVS Support

 **Shashi Kamath**  2025-Jun-05 4:51 PM

Can we buy a newer version of openviz ?

If yes, does it work with .net 4.8 without older versions?

What's the cost of the control ?

> Signature

 **AVS Support**  2025-Jun-05 5:04 PM

Hi Shashi,

I'd be happy to put you in touch with someone who could help you further in regard to licensing and support of OpenViz. (It is based on derived revenue in which the product is embedded, so please have that number ready for your discussion.)

Please provide your email, contact number, and a best time to be reached (please include your time zone).

To answer your technical question, it appears you are using v2.6. I believe that we do have later versions in v2 that would work with .NET 4.8 (still COM with .NET interops). We also have v4 which is a pure .NET version and would require you to update your codebase.

We would need to get more information about your development environment, language being used, if you are intending to move to the latest version of OpenViz, etc. and your deployment plan.

OpenViz is an API that is being used in your control, so not sure about your build environment outside of our API.

Thanks,

AVS Support

# EXHIBIT F

|  | 2016-2017 Prices | Per Amendment 2 |
|---|---|---|
| 2016 | $ 65,000.00 | $ 60,000.00 |
| 2017 | $ 65,000.00 | $ 60,000.00 |
| 2018 | $ 85,000.00 | $ 70,000.00 |
| 2019 | $ 85,000.00 | $ 70,000.00 |
| 2020 | $ 85,000.00 | $ 70,000.00 |
| 2021 | $ 115,000.00 | $ 90,000.00 |
| 2022 | $ 115,000.00 | $ 90,000.00 |
| 2023 | $ 115,000.00 | $ 90,000.00 |
| 2024 | $ 115,000.00 | $ 90,000.00 |
| 2025 | $ 115,000.00 | $ 90,000.00 |
|  | $ 960,000.00 | $ 780,000.00 |

| 2016-2017 | Rate Card |
|---|---|
| $0-1M; new product, no history | $ 45,000.00 |
| $1 - 2.9M | $ 65,000.00 |
| $3M - 9.9M | $ 85,000.00 |
| $10M - 19.9M | $ 115,000.00 |
| 20M | Quoted Individual |